United States District Court
District of Maine

|  |  |
|---|---|
| Clare E. Mundell,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Acadia Hospital, Corp.<br><br>and<br><br>Eastern Maine Healthcare Systems,<br><br>　　　　Defendants. | Civil No.: |

Complaint and Demand for Jury Trial
and Injunctive Relief Sought

Summary of the Civil Rights Action for Unequal Pay, Sex Discrimination,
and Retaliation.

1.　　Acadia Hospital, Corp. and Eastern Maine Healthcare Systems (together "Northern Light") paid Dr. Clare E. Mundell about half as much as her male counterparts for comparable work. Dr. Mundell earned $50 per hour as a pool psychologist for Northern Light, while her male pool psychologist colleagues earned $90–$95 per hour.

2. When Dr. Mundell complained to management about this pattern of strikingly different pay for male and female employees, Northern Light denied that it was gender-based but provided no explanation for the disparity. After a compensation study revealed widespread pay disparities across Acadia Hospital, Northern Light adjusted the pay for all pool psychologists (male and female) to $57. But even then, Acadia Hospital President Scott Oxley told Dr. Mundell that Northern Light would continue to pay the male psychologists $90 per hour for another three months to "ease their transition" to the new $57 per hour rate.

3. And, when Dr. Mundell resigned because she could no longer work for an employer that failed to take gender equality seriously, Northern Light departed from its standard practice and refused to allow her to work through her two-week notice period, denying Dr. Mundell the ability to responsibly and professionally transition her case load.

4. Dr. Mundell brings this civil rights action for unequal pay, sex discrimination, and retaliation.

## The Parties

5. Plaintiff Clare E. Mundell is a citizen of the United States and is a resident of Bangor, Penobscot County, Maine.

6. Defendant Acadia Hospital is a Maine nonprofit, tax-exempt corporation in Bangor, Penobscot County, Maine.

7. Defendant Eastern Maine Healthcare Systems is a Maine nonprofit, tax-exempt corporation in Brewer, Penobscot County, Maine.

8. Eastern Maine Healthcare Systems operates Acadia Hospital.

## Jury Trial Demand

9. Under Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## Jurisdiction and Venue

10. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the Maine Human Rights Act, 5 M.R.S. §§ 4553(2), 4572, 4633; the Maine Whistleblowers' Protection Act, 26 M.R.S. § 833; and the Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A. This Court has proper federal question and supplemental jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331, 1367.

11. Venue is proper in the District of Maine under 28 U.S.C. § 1391. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Bangor because the events giving rise to the claims occurred in Penobscot County.

## Factual Allegations

12.  Dr. Clare E. Mundell is a Licensed Clinical Psychologist. She holds a Doctorate Degree in Clinical Psychology and Master's Degrees in Social Work and Clinical Psychology.

13.  Dr. Mundell's professional education, experience, and training include the following:

- Dr. Mundell completed six years of post-doctoral coursework in psychoanalysis and psychoanalytic psychotherapy at the Psychoanalytic Institute of the Carolinas and The Pittsburgh Psychoanalytic Center;

- She was the sole trainee from the Pittsburgh Psychoanalytic Center selected to present a clinical case to a conference panel headed by Dr. Glen Gabbard, an internationally known psychoanalyst;

- She taught at the University of North Carolina at Chapel Hill, one of the country's top-ranked clinical psychology programs;

- She supervised psychiatry residents in psychotherapy at the University of North Carolina School of Medicine and the University of Pittsburgh School of Medicine;

- She has experience working in both private and public psychiatric hospitals, and in two successful private practices in different states; and

- She has authored numerous publications in professional journals, co-authored a textbook chapter, and presented at national conferences.

14. On July 3, 2017, Dr. Mundell received an offer of employment from Northern Light to work as a pool psychologist.

15. Dr. Mundell's offer included an hourly pay rate of $50 per hour.

16. The offer letter was signed by Acadia Hospital Chief Medical Officer Anthony Ng, M.D.

17. Dr. Mundell accepted Northern Light's offer of employment on July 21, 2017. Her orientation and start date was November 6, 2017.

18. Eastern Maine Healthcare Systems and Acadia Hospital functioned as a single or joint employer of Dr. Mundell throughout her employment.

19. Eastern Maine Healthcare Systems and Acadia Hospital have common management, closely interrelated operations, and together exert control over employment decisions.

20. At the outset of her employment, Northern Light required that Dr. Mundell complete on-site orientations at both the Eastern Maine Healthcare Systems main office and at Acadia Hospital.

21. Her employment orientation program was set by Eastern Maine Healthcare Systems and required that she understand and agree to follow

the Eastern Maine Healthcare Systems Code of Conduct, corporate compliance policies, and "core principles of the EMHS patient experience."

22. During her employment, Dr. Mundell was required to follow both Eastern Maine Healthcare Systems and Acadia Hospital policies and procedures. For example, Dr. Mundell was bound by the "EMHS Confidentiality and Information Security Agreement and Acceptable Use Agreement."

23. February and March 2020 written descriptions of proposed compensation and benefits to Dr. Mundell were made on Northern Light Health stationary, signed by the President of Acadia Hospital.

24. Dr. Mundell's employment benefits were offered through Eastern Maine Healthcare Systems, rather than Acadia Hospital.

25. Dr. Mundell excelled in the pool psychologist position. For example, in her 2019 performance evaluation, Dr. Mundell received an average rating of 4.97 on a scale of 1-5. Her supervisor described her as "a dependable and reliable colleague who presents with a high level of professionalism." She was further described as being "on the forefront of problem solving," "provid[ing] high quality work," and "an asset to the hospital and to the psychology team."

26. During her time at Northern Light, Dr. Mundell worked with four other pool psychologists: DP, FK, KC, and DEW.

27. Northern Light paid male pool psychologist DP $95 per hour and male pool psychologist FK $90 per hour.

28. Northern Light paid female pool psychologist KC $50 per hour and female pool psychologist DEW a salary equivalent to a rate of $48.82 per hour.

29. The male and female pool psychologists at Northern Light performed comparable work in positions that had comparable requirements relating to skill, effort and responsibility.

30. Yet, Northern Light paid the male pool psychologists almost twice as much as the female pool psychologists.

31. Northern Light required its pool psychologists to hold a doctoral degree and be licensed or license-eligible to practice psychology in Maine.

32. Pool psychologists were responsible for providing psychological services at Acadia Hospital, including psychological testing, psychological consultation, group psychotherapy, individual psychotherapy, and crisis intervention.

33. Pool psychologists arrived at Northern Light with the skills required to provide psychological services; they did not learn how to provide psychological services through on-the-job training.

34. The pool psychologist position required a high degree of analytical skill and mental exertion, including responding in real-time to

patients in group settings, evaluating patients for referral to diagnostic testing, and presenting and participating in monthly peer review meetings.

35. All pool psychologists were trained in use of physical restraints, though they did not need to employ them often, both because psychiatric technicians were typically present during sessions and because patients did not often exhibit behaviors that called for them.

36. The pool psychologists were supervised by the Acadia Hospital Chief Medical Officer, and later, by Acadia Hospital Lead Psychologist Lora Stanchfield, Ph.D.

37. The pool psychologists did not have authority to set policies or procedures or make purchases for the Psychology Department.

38. None of the pool psychologists supervised other employees.

39. Northern Light did not have any established seniority or merit increase systems for pool psychologist pay.

40. In October 2019, during a conversation in their shared office, FK told Dr. Mundell that he had heard a rumor that Northern Light was re-evaluating psychologist salaries.

41. During this conversation, Dr. Mundell mentioned her hourly rate of $50 per hour. FK told Dr. Mundell that the hospital was paying him and DP significantly more than her. He shared that his hourly rate had remained the same during his five years at the hospital.

42. FK did not negotiate for his $90 per hour rate; it was the rate Northern Light offered him.

43. Northern Light's gender-based pay discrepancies were not limited to the Acadia Hospital Psychology Department.

44. For example, Dr. Mundell learned that a male nurse anesthetist at Northern Light contracted through Nurse Anesthesia of Maine earned $165 per hour, while a female nurse contract anesthetist performing the same job and contracted through the same agency earned just $105 per hour.

45. On November 19, 2019, Dr. Mundell met with Acadia Hospital Chief Medical Officer John Campbell, M.D., and complained that she was being paid much less than her male pool psychologist counterparts, and further, that the discrepancy appeared to be gender-based.

46. Dr. Campbell told Dr. Mundell that Human Resources was evaluating salaries in all hospital departments and that she should wait for the outcome of that evaluation.

47. In January 2020, Dr. Mundell met with Acadia Hospital President Scott Oxley. He explained that Human Resources' pay evaluation had revealed "pay discrepancies across the hospital."

48. President Oxley further explained to Dr. Mundell that he intended to offer her a salaried position, with an equivalent hourly rate of $57 per hour.

49. Dr. Mundell told President Oxley that she was aware that Drs. FK and DP had been paid much more than she had since she started working at Northern Light.

50. President Oxley acknowledged the pay discrepancy but denied that it was due to gender bias.

51. Dr. Mundell told President Oxley that she wanted to be reimbursed for the discrepancy.

52. President Oxley said he could not do that but could instead offer her a one-time "bonus."

53. On February 7, 2020, Dr. Mundell had another meeting with President Oxley. He offered her a $57 per hour rate of pay, and a $5,000 "appreciation" bonus.

54. Dr. Mundell told President Oxley that she believed she was owed much more than $5,000 for back pay (given that she had been paid about half what her male colleagues had been paid for the past two-plus years), and explained that she was disappointed in the hospital's response to her complaint.

55. Dr. Mundell asked President Oxley why he thought the pay scales were so unequal as between women and men, and he responded, "I don't know, you'd have to ask Tony [Dr. Ng]."

56. Dr. Mundell asked President Oxley, "Aren't you interested in asking Tony?" and he responded, "That would be on you to pursue. What do you want me to do, go through every inequality I found and reimburse everyone?" Dr. Mundell replied, "If the woman was paid less, then yes."

57. Dr. Mundell told President Oxley that she was uncomfortable knowing that there were likely other women at the hospital making less than their male counterparts, but who were not aware of the discrepancies.

58. In late February 2020, Dr. Mundell learned that Human Resources' pay evaluation had uncovered gender-based pay discrepancies across multiple departments.

59. On February 26, 2020, Dr. Mundell again met with President Oxley. President Oxley said that Northern Light would not compensate her for the difference between her $50 hourly rate and the male psychologists' $90 and $95 per hour over the past two-plus years. Instead, he offered to pay her a "bonus" equal to the difference between her current $50 hourly rate and the **new** $57 hourly rate for all psychologists.

60. On March 4, 2020, President Oxley sent Dr. Mundell a "General Release of Claims," which reflected a version of the offer he had made on February 26.

61. That same day, Dr. Mundell met with President Oxley in his office and he revealed that the hospital would continue to pay the male

11

psychologists $90 per hour from February 7, 2020 until May 3, 2020 to "ease their transition" to the new $57 per hour rate.

62.     President Oxley's March 4, 2020 offer to Dr. Mundell was $20,000: (1) retroactive compensation for the difference between Dr. Mundell's $50 per hour rate and the new $57 per hour rate for her hours worked over the past two-plus years, and (2) the difference between her new $57 hourly rate and the $90 hourly rate the male pool psychologists would continue to make between February 7 and May 3, 2020.

63.     On March 6, 2020, Dr. Mundell emailed a notice of resignation to Dr. Campbell, President Oxley, and Dr. Stanchfield.

64.     Dr. Mundell explained in her resignation email that she was saddened to leave her deeply satisfying clinical work, but was profoundly disappointed with the sexism she had experienced at Northern Light and upper management's failure to see the pay discrepancy issue as a gender-based problem.

65.     Dr. Mundell planned to use the two weeks to responsibly and professionally transition her workload to the other pool psychologists.

66.     Once a therapeutic relationship is established with a patient, if the relationship needs to be terminated, that transition must be discussed with the patient with adequate notice.

67. Dr. Mundell did not receive any response to her March 6 resignation email.

68. On March 9, 2020, Dr. Stanchfield approached Dr. Mundell and told her that she did not need to come back to work after finishing the day.

69. Dr. Mundell understood Dr. Stanchfield to be speaking on behalf of Dr. Campbell and at his direction. She also understood that Dr. Stanchfield was telling her not to return to work, not asking her. Before Dr. Mundell sent her March 6 email, Dr. Stanchfield had asked Dr. Mundell to continue working for four weeks after she gave notice, but after her email, she was asked to leave that day.

70. In Dr. Mundell's experience, it was highly unusual for the hospital not to allow an employee to work through their notice period.

71. Northern Light's decision to require Dr. Mundell to leave her job without transitioning her workload was particularly upsetting, because Dr. Mundell did not have the opportunity to acknowledge or explain her departure to her patients.

72. From a clinical perspective, standard practice is to explicitly acknowledge and discuss practitioner transitions. Dr. Mundell ran an adolescent group and was particularly concerned about leaving this group without notice, since many of its members had attachment issues that could be exacerbated by her sudden departure. It was upsetting to Dr. Mundell and

13

damaging to her professional reputation that she was not able to appropriately transition her workload and was instead asked to abruptly leave without notice.

73. A reasonable psychologist would be dissuaded from opposing pay discrimination if doing so meant they would not be permitted to appropriately and professionally transition their case load, and instead their patient relationships would be abruptly terminated without notice.

74. If Dr. Mundell had not raised concerns about pay discrimination with hospital leadership, including in her resignation email, she would have been permitted to appropriately transition her case load and continue working for Acadia during her two week notice period.

75. Dr. Mundell's last day of employment with Northern Light was March 9, 2020.

### Administrative Exhaustion

76. On April 13, 2020, Dr. Mundell filed a complaint of sex discrimination and retaliation against Northern Light Health (Eastern Maine Healthcare Systems) and Acadia Hospital with the Maine Human Rights Commission.

77. On October 28, 2020, the Maine Human Rights Commission issued a Notice of a Right to Sue to Dr. Mundell.

78. On November 2, 2020, the Equal Employment Opportunity Commission issued a Notice of a Right to Sue to Dr. Mundell.

79. Under 5 M.R.S. § 4622, Dr. Mundell has satisfied one or more of the prerequisites to be awarded attorney's fees and all available damages under the Maine Human Rights Act.

80. Dr. Mundell has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claims

## Count I

### Denial of Equal Pay for Comparable Work in Violation of the Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A

81. The allegations in paragraphs 1-80 are realleged.

82. Northern Light failed to pay Dr. Mundell equal pay for comparable work, in violation of the Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A.

83. As a result of Northern Light's denial of equal pay, Dr. Mundell has suffered and will continue to suffer damages, including but not limited to unpaid wages.

## Count II

**Sex Discrimination in Violation of Title VII and the Maine Human Rights Act, 42 U.S.C. § 2000e-2(a)(1), 5 M.R.S. §§ 4553(2), 4572**

84.     The allegations in paragraphs 1-83 are realleged.

85.     Northern Light discriminated against Dr. Mundell on the basis of sex by paying her less than her male counterparts, in violation of Title VII of the Civil Rights Act of 1964 and the Maine Human Rights Act, 42 U.S.C. § 2000e-2(a)(1), 5 M.R.S. §§ 4553(2), 4572.

86.     As a direct and proximate result of Northern Light's sex discrimination, Dr. Mundell has suffered and will continue to suffer damages, including, but not limited to, unpaid wages and benefits, emotional pain and distress, inconvenience, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

## Count III

**Retaliation in Violation of Title VII, the Maine Human Rights Act, the Maine Whistleblower Protection Act, and the Maine Equal Pay Law, 42 U.S.C. § 2000e-3(a), 5 M.R.S. § 4633, 26 M.R.S. § 833(1)(A), 26 M.R.S. §§ 628**

87.     The allegations in paragraphs 1-86 are realleged.

88.     Northern Light retaliated against Dr. Mundell for reporting what she reasonably believed was unlawful sex and pay discrimination by refusing to allow her to continue to work during her two-week notice period in violation of Title VII of the Civil Rights Act of 1964, the Maine Human Rights

Act, the Maine Whistleblower Protection Act, and the Maine Equal Pay Law, 42 U.S.C. § 2000e-3(a), 5 M.R.S. § 4633, 26 M.R.S. § 833(1)(A), 26 M.R.S. §§ 628.

89.     As a result of Northern Light's retaliation, Dr. Mundell has suffered and will continue to suffer damages, including but not limited to unpaid wages and benefits, emotional pain and distress, inconvenience, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

**Wherefore,** Dr. Mundell requests relief against Northern Light as follows:

(a)     Enter declaratory relief that Northern Light violated Dr. Mundell's statutory civil rights to be free of pay discrimination on the basis of sex and unlawful retaliation;

(b)     Enter injunctive relief ordering Northern Light to:

- provide effective civil rights training for all human resources employees and all supervisors on the requirements of all applicable laws prohibiting employment discrimination because of sex, equal pay protection, and retaliation for engaging in protected conduct and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting the position;

- maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Dr. Mundell's counsel within seven days of each training session;

- post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;

- send a letter printed on Northern Light's letterhead to all of Acadia Hospital's employees advising them of the judgment in this case, enclosing a copy of their policies regarding anti-discrimination, anti-retaliation and equal pay protection, and stating that they will not tolerate any such discrimination, or retaliation, and will take appropriate disciplinary action against any employee or agent of Northern Light who engages in such discrimination;

(c)  Award Dr. Mundell back pay for lost wages and benefits;

(d)  Award Dr. Mundell unpaid wages for unequal pay;

(e) Award Dr. Mundell as liquidated damages in an amount equal to twice the amount of her unpaid wages for unequal pay;

(f) Award Dr. Mundell compensatory damages in an amount to be determined at trial by the jury;

(g) Award Dr. Mundell punitive damages in an amount to be determined at trial by the jury;

(h) Award Dr. Mundell full expenses and reasonable attorney's fees;

(i) Award Dr. Mundell pre-judgment interest; and

(j) Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: January 5, 2021

/s/ Valerie Z. Wicks
Valerie Z. Wicks, Esq.
Johnson, Webbert & Garvan, LLP
160 Capitol Street
Augusta, Maine 04332-0079
Tel: (207) 623-5110
vwicks@work.law

/s/ Carol J. Garvan
Carol J. Garvan, Esq.
Johnson, Webbert & Garvan, LLP
160 Capitol Street
Augusta, Maine 04332-0079
Tel: (207) 623-5110
cgarvan@work.law

*Attorneys for Plaintiff*