UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| CLARE E. MUNDELL, | ) ) ) ) |
| Plaintiff | ) ) |
| v. | ) Case No. 1:21-cv-00004-LEW ) |
| ACADIA HOSPITAL, CORP. and EASTERN MAINE HEALTHCARE SYSTEMS, | ) ) ) ) ) |
| Defendants | ) |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Claire Mundell has asserted two discrimination claims against Acadia Hospital Corp. ("Acadia Hospital" or the "Hospital") and Eastern Maine Healthcare Systems d/b/a Northern Light Health arising out of the fact that until the discrepancy was discovered, she was paid less than two male colleagues who had been hired more than two years before she was. The Hospital remedied the discrepancy between Plaintiff and her colleagues after it was discovered and the Hospital has articulated a clear non-discriminatory reason it happened. There is, therefore, at the very least a factual dispute as to whether Dr. Mundell's rate of pay was established on the basis of her sex. Plaintiff has, however, moved for partial summary judgment on Count I, a claim brought under the Maine Equal Pay Act ("MEPA"), arguing that this Court should enter judgment in her favor on liability and should also rule that she is entitled to three times the difference between what she was paid and what the highest paid male psychologist[1] was paid, simply on the strength of the fact that there was a discrepancy.

---

[1] The two male psychologists who were employed at the Hospital at the same time as Plaintiff were paid at different rates. DASMF ¶¶ 11, 13. Plaintiff's Statement of Material Facts ("PSMF") ¶ 9. In the letter her lawyers sent to the

Plaintiff's Motion for Partial Summary Judgment should be denied. First, Plaintiff's reading of the MEPA is untenable in light of the Hospital's obligation to comply with federal statutes and regulations governing fraud and abuse of federal health care programs. Second, even if the MEPA is not preempted by federal law, Defendants did not discriminate on the basis of sex by paying different wages to male and female psychologists. Third, to the extent the Court finds that a violation of the MEPA did, in fact, occur in regard to Plaintiff's compensation, Plaintiff is not entitled to treble damages because there are no "unpaid wages" due to her.

## STATEMENT OF FACTS

Acadia Hospital is a psychiatric hospital located in Bangor, Maine that provides both inpatient and outpatient care. Defendant's Additional Statement of Material Facts ("DASMF") ¶ 1. As part of a large healthcare system that bills to federal health care programs including Medicare and Medicaid, it is necessary for Acadia Hospital to achieve compliance with, among other laws, the False Claims Act, the Stark Law, and the Anti-Kickback Statute. DASMF ¶ 2. Violations of these federal statutes can result not only in hefty fines, but also criminal charges resulting in jail time. DASMF ¶ 4. In order to ensure compliance with these statutory schemes, Acadia Hospital endeavors to employ a fair market value approach to compensation. DASMF ¶ 5. This approach provides the most assurance possible that the organization successfully avoids one or more of the above-described punitive consequences of violating the letter and/or spirit of federal law. DASMF ¶ 6.

In or around 2014, Anthony Ng, M.D., who was then the Chief Medical Officer at the Hospital, decided that the Hospital needed to make a determined effort to hire psychologists to

---

Hospital (ECF Doc. 14-3), Plaintiff demanded to be paid the difference between what she had been paid and what the highest paid male was paid. Plaintiff nowhere explains why she is entitled to be paid more than the other male psychologist and nowhere supports the numbers in her demand letter with facts as would be admissible in evidence for the purpose of obtaining summary judgment. See Defendant's Opposing Statement of Material Facts ¶¶ 18-19.

assist with providing mental health services to its patients and he began this effort by recruiting Dr. DP, a local psychologist with an excellent reputation and connections both within the Hospital and also within the broader community. DASMF ¶¶ 7-8. After several months of negotiations, Dr. DP agreed to join the staff at the Hospital if he was offered an acceptable salary. DASMF ¶ 10. Dr. Ng and Dr. DP negotiated a salary of $95 per hour, a rate that was acceptable to Dr. DP and also in line with Dr. Ng's judgment as to the value of his services at the time, including his experience, availability, reputation and longstanding work in the community. DASMF ¶ 11. Approximately one year later, Dr. Ng hired a second psychologist, Dr. FK. DASMF ¶ 12. Dr. FK's salary was set with reference to Dr. DP's salary at a rate of $90 per hour.[2] DASMF ¶ 13.

When Dr. Mundell was hired by the Hospital in July 2017, approximately two years after Dr. FK was hired, Dr. Ng concluded, in consultation with Human Resources, that the market rate for her services was $50 per hour. DASMF ¶ 14; PSMF ¶ 2. This calculation took into account such factors as the Hospital's need for the services she would be performing, her prior work experience, the extent of her availability, and similar factors. DASMF ¶ 15. Dr. Mundell's rate of pay was established solely with reference to the market rate for her services as a pool psychologist and her sex had nothing to do with it. DASMF ¶ 16.

In early 2019, while Hospital management was conducting a hospital-wide review of employee compensation at Acadia, some discrepancies between the salaries of men and women in similar positions were discovered, but these discrepancies were not ascribed to gender since in some cases women were compensated at higher levels than their male counterparts and vice versa. DASMF ¶¶ 17-18. Among the discrepancies in compensation that were discovered was

---

[2] There is a dispute of fact as to whether Dr. FK negotiated his salary when he was hired by Acadia Hospital. *Compare* Decl. of Dr. FK (ECF Doc. 14-4) ¶ 4 *with* Decl. of Dr. Ng. ¶ 4; DASMF ¶ 13.

3

the disparity between pay levels of the pool psychologists. DASMF ¶ 19. Once this disparity was discovered, the Hospital worked to correct it by eliminating the disparity and bringing all of the psychologists' salaries as close to market level as the circumstances permitted. DASMF ¶ 20.

## ARGUMENT

### I. Standard for Summary Judgment

Summary judgment is appropriate only when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts are viewed in the light most favorable to the non-moving party and the court draws all reasonable inferences in favor of the non-moving party. *Fed. Ins. Co. v. Commerce, Inc. Co.*, 597 F.3d 68, 70 (1st Cir. 2010). *See also Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 8 (1st Cir. 2004) (A court "must resolve all evidentiary conflicts and draw all reasonable inferences in the nonmovant's favor."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

### II. The Maine Equal Pay Act is Impliedly Preempted by Federal Law

Plaintiff's contention that the MEPA requires Defendants to pay her at the same rate as the highest paid male psychologist, regardless of the fair market value of her services, conflicts with federal laws and regulations governing fraud and abuse of federal health care programs. Plaintiff's reading of the MEPA not only frustrates the purpose of the federal regulations

providing safe harbors from liability for certain compensation arrangements, it would also be impossible for Defendants to comply with both federal law and the MEPA.

Under the Supremacy Clause, federal law supersedes a contrary state law. U.S. Const. Art. 6, cl. 2 ("[T]he laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."). While some federal statutes explicitly bar certain types of state action, *see Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983), federal law may also preempt state power to regulate by implied preclusion of conflicting state regulations, *Kansas v. Garcia*, 140 S. Ct. 791, 801, 206 L. Ed. 2d 146 (2020) ("[I]t has long been established that preemption may also occur by virtue of restrictions or rights that are inferred from statutory law . . . And recent cases have often held state laws to be impliedly preempted.").

Conflict preemption arises when "compliance with both federal and state regulations is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963). *See, e.g. Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 486–87, 133 S. Ct. 2466, 2476–77, 186 L. Ed. 2d 607 (2013) (finding cause of action under New Hampshire law pre-empted where it was impossible for manufacturer to comply with both state and federal law governing warning labels of FDA-approved drugs). It can also arise where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). "If federal law imposes restrictions or confers rights on private actors and a state law confers rights or imposes restrictions that conflict with the federal law, the federal law takes

5

precedence and the state law is preempted." *Kansas v. Garcia*, 140 S. Ct. 791, 801, 206 L. Ed. 2d 146 (2020) (quotation and citation omitted).

There are several federal laws, including the Anti-Kickback statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral Law ("Stark Law"), 42 U.S.C. 1395nn, and the False Claims Act, 31 U.S.C. §§ 3729-3733, that target reducing fraud, including the submission of false claims, kickbacks for referrals, disguising prohibited remuneration to providers, and other fraudulent health care schemes aimed at defrauding federal health care programs like Medicare and Medicaid.

The federal Anti-Kickback Statute prohibits the exchange of payments, such as kickbacks, bribes, and rebates, to induce or reward the referral of business reimbursable by federal health care programs such as Medicare or Medicaid. *See* 42 U.S.C. § 1320a-7b. There are statutory exceptions specifying compensation practices that do not fall within the reach of the Anti-Kickback statute. *See* 42 U.S.C. § 1320a-7b(b)(3). Congress enacted section 14 of the Medicare and Medicaid Patient and Program Protection Act of 1987, Public Law 100-93 that required the promulgation of safe harbor provisions by the Department of Health and Human Services ("DHHS"). *See* 42 U.S.C. § 1320a-7B(3)(E); 42 C.F.R. 1001.952 *et seq*. *See also* 42 U.S.C.A. § 1320a-7d (guidance regarding application of health care fraud and abuse sanctions). The safe harbor regulations describe various compensation practices that are permissible practices. *See* 42 C.F.R. 1001.952. For example, the Anti-Kickback statute includes a personal services safe harbor provision, which provides that "remuneration" for purposes of the Anti-Kickback statute does not include payments made to an agent as compensation so long as specific requirements are met, including that the methodology for determining compensation

paid is "consistent with fair market value in arm's-length transactions. . ." *See* 42 C.F.R. § 1001.952(d)(5).

Similarly, the physician self-referral law, commonly referred to as the "Stark Law" prohibits physicians from making referrals or presenting claims for certain "designated health services" payable by Medicare to an entity with which the provider has a financial relationship. *See* 42 U.S.C. § 1395nn. The Stark Act lists several categories of "designated health services," including inpatient hospital services, which broadly includes bed and board, interns' and residents' services, nursing, drugs, supplies, transportation, and overhead. 42 C.F.R. §§ 409.10(a), 411.351. Like the Anti-Kickback statute, the Stark Law contains numerous exceptions to its otherwise broad applicability and authorizes DHHS to create additional exceptions for permissible financial relationships that do not pose a risk of abuse to federal health care programs. 42 U.S.C. § 1395nn(b)(4). One statutory exception is for bona fide employment relationships, provided that the remuneration is under an agreement that would be commercially reasonable even if no referrals were made to the employer, and the compensation is at fair market value[3] and does not take into account the volume of any referrals by the referring physician. *Id.* § 1395nn(e)(2).

The False Claims Act, broadly speaking, imposes civil liability for presenting a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Alleged violations of the Stark Law and the Anti-Kickback statute can serve as the basis for suits filed under the False Claims Act. *See, e.g. United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 169 (3d Cir.

---

[3] Generally, fair market value is defined as "the value in an arm's-length transaction, consistent with the general market value . . . ." 42 U.S.C. § 1395nn(h)(3). With respect to compensation, "general market value" means the compensation that would be paid at the time the parties enter into the service arrangement as the result of bona fide bargaining between well-informed parties that are not otherwise in a position to generate business for each other." 42 C.F.R. § 411.351.

2019), *cert. denied*, 140 S. Ct. 2720, 206 L. Ed. 2d 855 (2020) ("[T]he Stark Act never appears in court alone. Instead, it always come[s] in through another statute that creates a cause of action—typically, the False Claims Act."); *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009) ("Falsely certifying compliance with the Stark or Anti–Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.").

Violations of these federal statutes can result in significant fines. *See, e.g.* 31 U.S.C. § 3729(a) (proscribing penalties of not less than $5,000 and not more than $10,000 (adjusted for inflation) per false claim plus treble damages); 42 C.F.R. § 1395nn(g) (establishing penalties of up to $15,000 per service and up to $100,000 for circumvention schemes). The Anti-Kickback statute establishes criminal penalties for fraudulent acts involving federal health care programs and can result in fines of up to $100,000 and imprisonment of up to ten years. 42 U.S.C. § 1320(a)-7b(a)(6). Failure to comply with the Anti-Kickback statute may also result in the exclusion from participation in federal health care programs. *See* 42 U.S.C. § 1320a-7. Needless to say, as part of a large healthcare system that bills to federal health care programs including Medicare and Medicaid, it was necessary for Acadia Hospital to have procedures and systems in place to ensure the Hospital's compliance with these statutes.

The federal laws governing fraud and abuse of federal health care programs and the related statutory exceptions and regulatory safe harbor provisions results in a complex federal regulatory scheme. These federal laws and regulations strike a careful balance between protecting federal health care programs against fraud while limiting the reach of the statutes by permitting specific non-abusive arrangements to promote beneficial innovation and better patient care. *See, e.g. Medicare and State Health Care Programs: Fraud and Abuse; Revisions to Safe*

*Harbors Under the Anti-Kickback Statute, and Civil Monetary Penalty Rules Regarding Beneficiary Inducements*, 85 FR 77684-01 (Dec. 2, 2020). In enacting the Anti-Kickback statute and Stark Law and giving DHHS the direction and authority to create safe harbors, Congress determined that health care institutions could be free from criminal and civil liability if they paid their providers pursuant to certain compensation arrangements, thereby eliminating the possibility that their providers were receiving prohibited compensation such as kickbacks, impermissible referral fees, etc. *See Wyeth v. Levine*, 555 U.S. 555, 576, 129 S. Ct. 1187, 1200–01, 173 L. Ed. 2d 51 (2009) ("This Court has recognized that an agency regulation with the force of law can pre-empt conflicting state requirements.").

It is necessary for a large health care institution like Defendants that employ thousands of individuals to implement processes to minimize risk and ensure compliance with federal law to avoid civil liability, criminal prosecution, and potential exclusion from federal health care programs. As a result, even though not every provision of each federal law discussed above applies to all of its employees, Defendants mitigate the risk by implementing system-wide practices to ensure compliance. As Plaintiff sees it, under the MEPA, the Hospital was required to pay her at the same rate of the highest paid male psychologist ($95) regardless of the fair market value of her services ($50). This is problematic for the Hospital's compliance with federal law: compensation that exceeds the fair market value of the services provided implies that the compensation is really for impermissible referrals. *See, e.g. UPMC*, 946 F.3d at 169 ("Compensation for personal services above the fair market value of those services can suggest that the compensation is really for referrals. This is just common sense. Healthcare providers would not want to lose money by paying doctors more than they bring in. They would do so only if they expected to make up the difference another way."). Plaintiff's reading of the MEPA is

impliedly preempted because it conflicts with Congress' decision to protect certain compensation arrangements and payment practices from enforcement and penalties under federal laws governing fraud and abuse of federal health care programs. The basic premise of Plaintiff's claim is that under the MEPA, she can override the Hospital's fair market value approach regardless of its obligation to set compensation in order to avoid significant penalties and criminal prosecution under federal law. This reading of the MPEA is untenable because it conflicts with federal laws and the safe harbor provisions promulgated by DHHS that specifically exempt certain compensation practices or arrangements.

Based on Plaintiff's reading of the MEPA, it would be impossible for the Hospital to ensure compliance with federal laws like the Anti-Kickback statute, the Stark Law and the False Claims Act and at the same time comply with the MEPA. As a result, the Court should find that the MEPA, as Plaintiff construes it, is preempted by federal law. At the very least, there is a factual dispute as to whether Defendants can comply with the MPEA while at the same time ensuring compliance with federal law and therefore summary judgment must be denied.

### III. The Pay Discrepancy was based on Defendants' Application of a Fair Market Value approach to Compensation

Against the backdrop of facts supporting the Hospital's contention that Plaintiff's pay was not set on the basis of her sex and the Hospital did not discriminate against her, Plaintiff nonetheless claims that the Court should enter summary judgment in her favor because she was paid less than Dr. DP.  She thus essentially argues that the Court should read the words "discriminate" and "on the basis of sex" out of the MEPA, and hold that any time a person is paid less than an individual of the opposite sex – for any reason that is not based on seniority, a merit increase system or a shift differential – the lessor paid person is owed three times the

difference between their salary and the highest salary paid to the person of opposite sex. This is simply not what the statute says and Plaintiff's argument should be rejected.

The Maine Supreme Judicial Court has never had the occasion to construe the MEPA and Plaintiff cites no federal law in her motion in apparent recognition that the federal equal pay act is substantially different from the MEPA and thus Maine's highest court would likely not follow federal precedent in construing the law. *See Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 26, 157 A.3d 223, *as corrected* (Mar. 23, 2017).[4] The Court is thus left with the plain language of the statute which prohibits discrimination "on the basis of sex." *In re Wage Payment Litigation*, 2000 ME 162, ¶ 4, 759 A.2d 217 ("When construing a statute, we seek to give effect to the legislative intent by examining the plain meaning of the statutory language.").

Because there is clearly a question of fact in this case as to whether Dr. Mundell was paid less than Dr. DP and FK based on sex, her motion for partial summary judgment must be denied.

### IV. Plaintiff is Not Entitled to Recover Unpaid Wages Plus Twice that Amount as Liquidated Damages

To the extent the Court finds that Plaintiff has established a violation of the MEPA, Plaintiff is not entitled to the remedies sought in her Motion for Partial Summary Judgment.

---

[4] Federal Equal Pay Act claims are subject to a burden-shifting analysis, *see Corning Glass Works v. Brennan*, 417 U.S. 188, 195-96 (1974). Under that framework, "the plaintiff must first establish a prima facie case by showing that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility." *Ingram v. Brink's, Inc.*, 414 F.3d 222, 232 (1st Cir. 2005) (citing *Corning Glass Works*, 417 U.S. at 195). If the plaintiff meets this burden and "establishes a prima facie case of an unlawful wage differential, the burden shifts to the employer to show that the differential is justified under one of the [EPA]'s four exceptions," which "serve as affirmative defenses on which the employer carries the burden of proof, not just production." *Id.* Thus, the employer must demonstrate that the pay differential was "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Although the Maine Equal Pay Act ("MEPA") does not expressly include a "catch-all" defense as the federal Equal Pay Act does, 29 U.S.C. § 206(d)(1), the plain language of the MEPA is clearly aimed at prohibiting discrimination "on the basis of sex." *See* 26 M.R.S.A. § 628 ("An employer may not *discriminate* in the same establishment *on the basis of sex* . . .") (emphasis added).

Plaintiff argues that she is entitled to recover unspecified "unpaid wages" plus "an additional amount equal to twice the amount of unpaid wages as liquidated damages" under 26 M.R.S. § 626-A.  Partial MSJ, ECF No. 13 at 6.  Plaintiff is not entitled to this remedy for the simple reason that Plaintiff is suing for discrimination, not for unpaid wages.  *Compare* 26 M.R.S. § 629 (prohibiting employers from requiring uncompensated work), *with* 26 M.R.S. § 628 (prohibiting "discriminat[ion] . . . on the basis of sex" by paying unequal wages).  As discussed in further detail below, the appropriate remedy for a MEPA violation – other than an order requiring compliance with Section 628 – "is the not insignificant civil forfeiture penalties that can be brought by the Attorney General."  *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16, 759 A.2d 217.  This is true regardless of whether civil forfeiture penalties have been sought by the Attorney General against the employer in a particular case.  *Id.* ¶ 16 n.6.

    The MEPA itself does not include a specific remedies provision.  *See* 26 M.R.S. § 628.  Rather, the MEPA is listed in the general penalties statute, 26 M.R.S.A. § 626-A, of subchapter 2: Wages and Medium of Payment.  That provision provides, in relevant part:

> Whoever violates any of the provisions of sections 621-A to 623 or section 626, 628, 628-A, 629 or 629-B is subject to a forfeiture of not less than $100 nor more than $500 for each violation.
>
> Any employer is liable to the employee or employees for the amount of unpaid wages and health benefits. Upon a judgment being rendered in favor of any employee or employees, in any action brought to recover unpaid wages or health benefits under this subchapter, such judgment includes, in addition to the unpaid wages or health benefits adjudged to be due, a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages.

26 M.R.S. § 626-A.  As this Court has recognized, and as Plaintiff acknowledges, Section 626-A "is not a model of clarity."  *Noll v. Flowers Foods, Inc.*, No. 1:15-CV-00493-LEW, 2021 WL 904859, at *5 (D. Me. Mar. 9, 2021).

Section 626-A "introduces a rather obvious ambiguity due to the separation between the first and second paragraphs." *Id.* The Law Court addressed that ambiguity nearly three decades ago in *Cooper v. Springfield Terminal Railway Co.*, 635 A.2d 952 (Me. 1993). In *Cooper*, employees of Springfield Terminal sued the company for requiring them "to qualify for new positions by training without pay" in violation of 26 M.R.S. § 629, "which prohibits uncompensated work as a condition of securing or retaining employment." *Id.* at 954. The Law Court upheld the trial court's finding that Springfield Terminal had violated Section 629. *Id.* at 955. The court then addressed what remedies were available for that violation and concluded that the employees were entitled to recover "unpaid wages, liquidated damages, costs and attorney fees under the penalty provisions of section 626–A." *Id.* The court explained:

> The first paragraph of section 626–A explicitly states that it is applicable to violations of section 629, while the second paragraph provides for the aforementioned penalties in any action brought under the subchapter of which section 629 is a part. Additionally, the second paragraph specifically makes employers liable for "unpaid wages," which is precisely what is owing when an employer does not pay an employee for work.

*Id.* Accordingly, under *Cooper*, "employee remedies against employers are indeed available for employer violations of the entire list of statutory provisions found in the first paragraph, *provided* that the underlying conduct gives rise to a claim for 'unpaid wages or benefits' . . . ." *Noll*, 2021 WL 904859, at *5.

In contrast with *Cooper*, the Law Court held in *In re Wage Payment Litigation*, 2000 ME 162, 759 A.2d 217, that the plaintiff employees were not entitled to recover "unpaid wages" where their wages were paid late, i.e., after the deadline established in a since-repealed statutory provision requiring that wages be paid on a weekly basis, *id.* ¶ 16. The Law Court explained:

> The right of the employee created by section 626–A is to sue to collect "unpaid wages under this subchapter." 26 M.R.S.A. § 626–A. The term "unpaid wages," however, is not explicitly defined in section 626–A, nor is it defined in section 621.

13

> It is appropriate, then, to look to the legislative scheme of which it is a part to ascertain the meaning of "unpaid wages." *See City of Rockland*, 1998 ME 238, ¶ 5, 721 A.2d at 982. We have previously stated that "unpaid wages" under section 626–A "[are] precisely what [are] owing when an employer does not pay an employee for work." *Cooper v. Springfield Terminal Ry. Co.*, 635 A.2d 952, 955 (Me. 1993). It is not disputed that, in the case of these employees, their wages were ultimately paid.

*Id.* ¶ 12. Thus, if an employer "pays all wages in full" after the statutory deadline, "that employer is not subject to an employee's private right of action under section 626–A" for unpaid wages, but "the employer *is* subject to a civil forfeiture brought by the Attorney General pursuant to the same section." *Id.* ¶ 16.

The remedy for the enforcement of an unequal wage, like "[t]he remedy for the enforcement of a 'late' wage" cannot be a recovery of "unpaid wages" because, in both situations, the employee has been paid. *See id.; see also Cooper*, 635 A.2d at 955 (defining "unpaid wages" as "what [are] owing when an employer does not pay an employee for work"). Instead, the remedy "is the not insignificant civil forfeiture penalties that can be brought by the Attorney General." *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16, 759 A.2d 217. Any other conclusion would be inconsistent with the Law Court's decisions in both *Cooper* and *In re Wage Payment Litigation*.[5] *Cf. Beckwith v. United Parcel Service, Inc.*, 889 F.2d 344, 350-51 (1st Cir. 1989) (rejecting employee's argument that he was entitled to liquidated damages and attorney's fees under section 626-A for employer's violation of statute prohibiting employer from satisfying claims against employee through payroll deduction, 26 M.R.S.A. § 629, recognizing the distinction between wages not paid, as in work without monetary compensation, and compensation returned).

---

[5] Furthermore, if Plaintiff could prove that the difference in wages was motivated by discriminatory intent, she would be entitled to a remedy under her claim for discrimination in Count II.

Additionally, construing Section 626-A as permitting recovery of "unpaid wages" for a violation of Section 628 based on payment of unequal wages would lead to absurd and unreasonable results. *See 20 Thames St. LLC v. Ocean State Job Lot of Me. 2017, LLC*, 2020 ME 55, ¶ 8, 231 A.3d 426 (stating that, in construing statutes, courts "will avoid results that are absurd, inconsistent, unreasonable, or illogical" (alteration and quotation marks omitted)). An employee may not realize that they are being paid an unequal wage for years or even decades. If the employee was permitted to recover the difference between the wage they were paid and the wage they contend they should have been paid for those years or decades as "unpaid wages," plus double that amount as liquidated damages, the recovery would be financially devastating for the employer. In contrast, an employee who is not being paid at all is unlikely to continue working for that employer for a long period of time.

This construction is also consistent with the Department of Labor's Rules Relating to Equal Pay. *See In re Wage Payment Litig.*, 2000 ME 162, ¶ 10, 759 A.2d 217 (observing that "our interpretation [of Section 626-A] is in harmony with that of the Department of Labor"); *see generally* 12-170 C.M.R. ch. 12, §§ I-V. The Rules establish a process through which a person who believes that they have been discriminated against in violation of MEPA may file a complaint with the Bureau of Labor Standards. *Id.* § III(A). If the Bureau of Labor Standards determines that the complaint states a claim upon which relief may be granted, the Bureau is required to conduct an investigation, which may include gathering evidence and holding fact-finding hearings. *Id.* § III(B)-(D). If, following the investigation, the Bureau finds reasonable cause to believe that discrimination has occurred under the MEPA and the Department of Labor's Rules, the Bureau may either "[s]eek a voluntary compliance agreement signed by the employer that eliminates the unlawful practice and provides appropriate relief to the aggrieved

party," or "[r]efer the complaint to the Attorney General, informing the Attorney General of the relevant facts and recommending the commencement of a civil enforcement action." *Id.* § III(F). The Rules do not define "appropriate relief." Presumably, if the Department of Labor understood Section 626-A to provide the remedy for violations of Section 628, its Rules would cite to that provision to define "appropriate relief."

Finally, both the statutory scheme and Department of Labor Rules evidence an emphasis on compliance. As discussed above, the MEPA prohibits employers from "discriminat[ing] between employees . . . on the basis of sex" by paying wages of different rates to employees of opposite sexes. 26 M.R.S. § 628.[6] The Department of Labor Rules include a presumption of compliance for employers who complete a "self evaluation" meeting certain requirements:

> Where an employer, charged under this chapter with unlawful discrimination, has completed a self evaluation which meets the standards set forth in Section V and can also make an affirmative showing that progress is being made towards removing or preventing wage differentials based on gender, in accordance with that evaluation, including implementing any required remediation plan, the Bureau will then presume that the employer has not engaged in gender discrimination in violation of this chapter.

12-170 C.M.R. ch. 12, § IV(A). This presumption "may be strengthened where, throughout the self-evaluation, including any needed remediation, the employer maintains communication with and keeps employees apprised of the established process." *Id.* § V(B). Accordingly, the Rules plainly favor securing compliance and transparency rather than imposing harsh punitive remedies.

In sum, Plaintiff is not entitled to recover "unpaid wages" plus "an additional amount equal to twice the amount of unpaid wages as liquidated damages" under 26 M.R.S. § 626-A

---

[6] The final paragraph of the law, which provides that "[t]he Department of Labor shall annually report to the joint standing committee of the Legislature having jurisdiction over labor matters on progress made in the State to comply with this section" further illustrates the compliance purpose of the law.

16

because Plaintiff has been paid for the work she performed. The only monetary remedy available "is the not insignificant civil forfeiture penalties that can be brought by the Attorney General." *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16, 759 A.2d 217. *See also Beckwith,* 889 F.2d at 351 (recognizing that "employers are subject to the civil forfeiture penalty contained in the first paragraph of § 626–A, which should serve as some deterrent against truly unfair wage withholding agreements.").

## CONCLUSION

Plaintiff's reading of the Maine Equal Pay Act is preempted by federal laws, including the Anti-Kickback statute, Stark Law, and the False Claims Act, which are aimed at eliminating fraud and abuse of federal health care programs. At the very least, there is a factual dispute as to whether Defendants can comply with the MEPA while at the same time ensuring compliance with federal law and also whether the pay disparity was, in fact, based on sex. Moreover, even if the Court finds that the MEPA is not preempted by federal law and that Plaintiff has established a violation of the MEPA, she is not entitled to recover the remedies she seeks. Based on the foregoing reasons, Plaintiff's Partial Motion for Summary Judgment should be denied.

Dated: September 22, 2021

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Kasia S. Park*
　　　　　　　　　　　　　　　　　　　　　　　Melissa A. Hewey
　　　　　　　　　　　　　　　　　　　　　　　Kasia S. Park
　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Defendants

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, Maine 04101-2480
Tel: (207) 772-1941
E-mail: mhewey@dwmlaw.com
E-mail: kpark@dwmlaw.com