UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CLARE E. MUNDELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-cv-00004-LEW |
| | ) | |
| ACADIA HOSPITAL CORP. and | ) | |
| EASTERN MAINE HEALTHCARE | ) | |
| SYSTEMS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND DEFENDANTS' MOTION FOR LEAVE TO FILE
AND MOTION FOR CERTIFICATION**

This matter stands before the court on Plaintiff Clare Mundell's Motion for Partial Summary Judgment (ECF No. 13) against Defendant Acadia Hospital on her claim under the Maine Equal Pay Law, 26 M.R.S. § 628. Following oral argument on the Motion for Partial Summary Judgment, Defendants Acadia Hospital and Eastern Maine Healthcare Systems filed a Motion for Leave to File (ECF No. 28) a Motion for Certification of Question of State Law to the Law Court (ECF No. 28-1).

Defendants' Motion for Leave to File is granted. For reasons that follow, Defendants' Motion for Certification is denied and Plaintiff's Motion for Partial Summary Judgment is granted.

1

## BACKGROUND

Plaintiff Clare Mundell is a Licensed Clinical Psychologist with graduate degrees in Clinical Psychology and Social Work. Beginning in 2017, Plaintiff was employed as a pool psychologist by Acadia, a nonprofit hospital located in Bangor, Maine.[1] Acadia employed four other pool psychologists during this time, two of whom were male and two of whom, like Plaintiff, were female. Acadia paid the two male psychologists at a rate of $95 and $90 per hour, but only paid Plaintiff and the other female pool psychologists $50 per hour.

By all accounts, all five of Acadia's pool psychologists, including Plaintiff, possessed the same fundamental qualifications for the role: they all held doctoral degrees, were licensed to practice psychology in Maine, and had experience and skills in providing psychological services. All five pool psychologists performed the same functions for Acadia. Acadia did not have a seniority system or merit increase system in place for paying its employees, and the summary judgment record suggests that pool psychologist's salaries did not change over time. Acadia claims to set salaries for pool psychologists and other employees based on the fair market value of each employee's services. At least one of the

---

[1] In the Complaint, Plaintiff alleges that she was jointly employed by both Defendants. *See* Compl. ¶ 18 (ECF No. 1). Plaintiff's formal employer was Acadia, and she brings her Motion for Summary Judgment only against Acadia.

male pool psychologists negotiated his salary before starting in the position, which Acadia argues is consistent with the fair market value approach to salary setting.

When Plaintiff discovered the pay disparity between male and female pool psychologists, she brought it to the attention of higher-ups at Acadia. Around this time, Acadia independently became aware of several gender pay disparities among hospital employees and began a process to standardize pay across genders. After a series of conversations between Plaintiff and Acadia in which the parties attempted to arrive at a mutually agreeable solution, Plaintiff informed Acadia that she intended to resign due to her dissatisfaction with the gender pay disparity. Though Plaintiff intended to resign two weeks following her notice, she was terminated three days after she gave notice.

Plaintiff filed complaints for sex discrimination and retaliation with the Equal Employment Opportunity Commission and Maine Human Rights Commission and, after exhausting the administrative process, filed this action. Plaintiff alleges that Defendants violated the Maine Equal Pay Law, 26 M.R.S. § 628, by paying male and female employees different wages for comparable work; that Defendants' failure to provide equal pay amounted to gender discrimination in violation of the Maine Human Rights Act, 5 M.R.S. § 4572, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); and that Defendants committed unlawful retaliation by firing Plaintiff after she complained of what she believed to be gender-based discrimination. Plaintiff seeks declaratory and injunctive relief, liquidated damages under 26 M.R.S. § 626-A, and damages for unfairly denied

wages and other compensation. Plaintiff now moves for summary judgment on only the Maine Equal Pay Law claim against Defendant Acadia.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in their favor. *Triangle Trading Co. v. Robroy Indus.*, *Inc.*, 200 F.3d 1, 2 (1st Cir. 1999).

## ANALYSIS

Under the Maine Equal Pay Law ("MEPL"), no employer may pay an employee "at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable work on jobs that have comparable requirements relating to skill, effort and responsibility." 26 M.R.S. § 628. MEPL also authorizes affirmative defenses under which an employer may escape liability by showing that any pay differences were based on

otherwise non-discriminatory "established seniority systems or merit increase systems or difference[s] in the shift or time of the day worked." *Id.*

The undisputed facts of this case establish the core elements of Plaintiff's pay discrimination claim. The parties agree that Acadia paid Plaintiff and other female pool psychologists less than it paid male pool psychologists; that the pool psychologists all occupied the same job and performed comparable work to one another; and that these pay differences were not due to an established seniority system, merit pay system, or shift differences. The parties' main point of disagreement is whether that alone is sufficient to establish liability under MEPL, in which case Plaintiff prevails as a matter of law, or whether Acadia must also have had a discriminatory motive, in which case this matter should proceed to trial to resolve the factual dispute. The parties also dispute whether the answer to this question should be resolved by the Maine Supreme Judicial Court (the "Law Court") through the certification process found in Rule 25 of the Maine Rules of Appellate Procedure.

## A. Defendants' Motion for Certification of a Question of Law

Acadia asks that I certify to the Law Court the issues of whether (1) MEPL liability is limited to instances in which employers expressly and consciously discriminate based on gender and (2) whether 26 M.R.S. § 626-A makes treble damages available for violations of MEPL. Mot. for Cert. (ECF No. 28-1). When faced with potentially outcome-determinative questions of Maine law for which "there is no clear controlling precedent in the decisions of the Supreme Judicial Court," a federal court may certify those questions to the Supreme Judicial Court "for instructions" on how to rule.  Me. R. App. P. 25. But "a

federal court sitting in diversity should not simply throw up its hands" in the face of undecided state law questions. *Butler v. Balolia*, 736 F.3d 609, 612–13 (1st Cir. 2013). As the Supreme Court recently reiterated, certification on a question of state law is never "obligatory," but instead "rests in the sound discretion of the federal court." *McKesson v. Doe*, 141 S. Ct. 48, 51 (2020) (quotation omitted).

While "certification is advisable" in certain "exceptional circumstances," *id.*, "certification is inappropriate when the course that the state courts would take is reasonably clear." *Gonzalez Figueroa v. J.C. Penney Puerto Rico, Inc.*, 568 F.3d 313, 323 (1st Cir. 2009). Here, as will be explained below, "the plain language of the statute, legislative history and public policy, all" point in the same direction and make the correct constructions of MEPL and § 626-A sufficiently clear. *See Int'l Ass'n of Machinists & Aerospace Workers v. Verso Corp.*, 121 F. Supp. 3d 201, 227 (D. Me. 2015) (quotation omitted). Accordingly, I deny Defendants' Motion for Certification.

## B. Plaintiff's Motion for Summary Judgment

### 1. *Application of the Maine Equal Pay Law*

As the Law Court "has not spoken directly on the question at issue," I must "predict 'how that court likely would decide the issue.'" *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011) (quoting *Gonzalez Figueroa v. J.C. Penney P.R., Inc.*, 568 F.3d 313, 318-19 (1st Cir. 2009)). Of course, there is a certain fiction to this standard: rare is the case that does not present at least *some* legal question on which the relevant judicial body has not spoken "directly." Every application of state law to a new fact pattern arising in federal court necessarily entails some amount of prediction. Still, I am wary not to venture so far afield

6

as to "blaze a new trail that the [Maine] courts have not invited." *Jones v. Secord*, 684 F.3d 1, 11 (1st Cir. 2012). Instead, I interpret MEPL in light of "the relevant statutory language, analogous decisions of the [Law Court], decisions of the lower state courts, and other reliable sources of authority," *Barton*, 632 F.3d at 17, including the "interpretive methods and canons of construction" employed by Maine courts, *Coffey v. New Hampshire Jud. Ret. Plan*, 957 F.3d 45, 49 n.3 (1st Cir. 2020). Ultimately, I "assume that the state courts would adopt the rule which, in [my] view, is supported by the thrust of logic and authority." *Moores v. Greenberg*, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987) (quotation omitted).

"When interpreting a statute, [I will] give effect to the Legislature's intent by considering the statute's plain meaning and the entire statutory scheme of which the provision at issue forms a part." *Scamman v. Shaw's Supermarkets*, *Inc*., 2017 ME 41, ¶ 14, 157 A.3d 223, 229 (quotation marks omitted). "Only if the plain language of the statute is ambiguous" should I "look beyond [it] "to examine other indicia of legislative intent, such as legislative history." *Id.* "Statutory language is considered ambiguous if it is *reasonably* susceptible to different interpretations." *Id.* (emphasis added).

I look first to the plain language of the statute. MEPL states, in relevant part: "An employer may not discriminate between employees . . . on the basis of sex *by* paying [unequal wages] for comparable work …." 26 M.R.S. § 628 (emphasis added).[2] This

---

[2] The entire sentence reads as follows:

An employer may not discriminate between employees in the same establishment on the basis of sex by paying wages to any employee in any occupation in this State at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable work on jobs that have comparable requirements relating to skill, effort and responsibility.

26 M.R.S. § 628.

sentence contains two clauses connected by a preposition. The first clause states that employers may not discriminate on the basis of sex. The second clause establishes how an employer discriminates on the basis of sex for purposes of the statute: by paying unequal wages. The syntactical sinew lashing the two clauses together is the preposition "by," which is defined as "through the means or instrumentality of," or "through the work or operation of." *By*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 307 (1961). Thus the means through which discrimination is achieved, for the purpose of MEPL, is the payment of unequal wages for comparable work. It is irrelevant that the phrase "discriminate on the basis of sex" in other contexts may sometimes require a showing of intentional discrimination, because MEPL defines discrimination to mean any unjustified pay disparity. Likewise, if a referee at a football game were to instruct that "players may not engage in unsportsmanlike conduct by celebrating after a touchdown," it would be beside the point to argue about whether a particular celebration was unsportsmanlike—the referee removed all ambiguity by defining the conduct that is deemed unsportsmanlike. Just so here: the act of paying unequal wages for comparable work establishes discrimination on the basis of sex under the statute.

Case law interpreting the Federal Equal Pay Act ("FEPA") reinforces that this is the only reasonable interpretation of MEPL. *See Gordon v. Maine Cent. R.R.*, 657 A.2d 785, 786 (Me. 1995) (where the Law Court has not yet interpreted a statute, "Maine Courts may look to analogous federal statutes, regulations, and case law for guidance"). Though MEPL predates FEPA, the Maine legislature amended MEPL shortly after FEPA's passage to bring the laws closer in line with one another, resulting in laws that are nearly identical in

both text and structure. *Compare* P.L. 1965, ch. 150, § 628 *with* 29 U.S.C. § 206(d)(1).
Like MEPL, FEPA states in relevant part that employers may not "discriminate . . . on the
basis of sex by paying [unequal wages] for equal work." 29 U.S.C. § 206(d)(1). The US
Supreme Court has interpreted this language to require only a showing "that the employer
pays workers of one sex more than workers of the opposite sex for equal work." *Corning
Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). A "plaintiff need not show that the
defendant was motivated by a discriminatory animus." *McMillan v. Massachusetts Soc. for
Prevention of Cruelty To Animals*, 140 F.3d 288, 298 (1st Cir. 1998). An employer may
avoid FEPA liability by establishing that it lacked a discriminatory motive, but the
employer's motive only enters the equation through one of FEPA's affirmative defenses,
not as an element of the plaintiff's case. *See id*.

While Maine courts construing MEPL are not bound by the federal courts' reading
of the analogous language in FEPL, they would likely find it persuasive authority. Where,
as here, statutory language is "obviously transplanted from another legal source . . . it brings
the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47
Colum. L. Rev. 527, 537 (1947). Indeed, other state equal pay laws with similar language
have been construed, like FEPA, to lack an intent requirement. *See, e.g.*, *Jancey v. Sch.
Comm. of Everett*, 658 N.E.2d 162, 170 (Mass. 1995); *Vermont Hum. Rts. Comm'n v.
Vermont Dep't of Corr.*, 136 A.3d 188, 196 (Vt. 2015).

That an employer's intent is irrelevant under MEPL is further reinforced by the fact
that MEPL, unlike FEPA, lacks a catchall affirmative defense for pay "differential[s] based

on any other factor other than sex." 29 U.S.C. § 206(d)(1).[3] In this respect, MEPL is similar to Massachusetts' Equal Pay Law, which that state's Supreme Judicial Court has read to "create[] a form of strict liability" because the statute's "plain text" makes no reference to an employer's discriminatory motive or lack thereof. *See Jancey*, 658 N.E.2d at 170. I find its interpretation of the text of the state equal pay law viz-a-viz FEPA to be persuasive and expect that the Law Court would give effect to this significant textual difference between MEPL and FEPA. *See State v. Greenwald*, 454 A.2d 827, 830 (Me. 1982) (assuming that, where a Maine statute closely tracks a statute from another jurisdiction but omits one or more key phrases, the Legislature intended to give effect to those differences). I will not will into existence by judicial fiat a catchall affirmative defense that does not exist in the text of the law.

A review of Law Court precedent makes clear that, were that court to address the issue, it would hold that MEPL does not require a showing of discriminatory intent. Such a ruling would be in keeping with the Law Court's broader anti-discrimination jurisprudence. For example, in *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253 (Me. 1979), the Law Court relied on analogous federal precedent to hold that a claim premised on disparate impact does not require proof of the employer's discriminatory

---

[3] On the issue of defenses, MEPL is terse and to the point: "Differentials that are paid pursuant to established seniority systems or merit increase systems or difference in the shift or time of the day worked that do not discriminate on the basis of sex are not within this prohibition." 26 M.R.S. § 628.

intent. *Id.* at 1261; *see also Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, 157 A.3d 223, as corrected (Mar. 23, 2017).

Though the Law Court looks to persuasive federal authority when relevant, it does so only "when the federal and state laws are substantially identical," and otherwise construes Maine discrimination laws to give effect to any differences between analogous state and federal statutes. *Scamman*, 2017 ME 41, ¶ 26, 157 A.3d 223. In *Scamman*, the Law Court declined to adopt the employer-favorable standard that governs federal age-based discrimination claim—the "reasonable factor other than age" standard found in the federal Age Discrimination in Employment Act—because even though the MHRA was ambiguous on the issue of the appropriate legal standard, the MHRA's language did not support the application of a different standard in age discrimination cases than in other discrimination cases under the MHRA. *See* 2017 ME 41, ¶ 22, 157 A.3d 223, 231 ("This history suggests that the Legislature has chosen—intentionally—not to limit the scope of its protections against age discrimination by providing for an RFOA defense.").

The interpretive parallels between *Scamman* and this case are apparent. But there is one important difference. *Scamman* presented an interpretive issue arising from the MHRA's lack of a statutorily-prescribed standard for age discrimination, an ambiguity which might have been resolved by reference to analogous federal law.  MEPL, on the other hand, contains no such ambiguity—as discuss above, the Legislature clearly defined what conduct was banned under MEPL and spelled out the available defenses, while withholding the more employer-friendly catchall defense found in FEPA. Thus in this case,

11

even more so than in *Scamman*, the Law Court's interpretive approach demands that I effectuate the differences between MEPL and FEPA.

For the foregoing reasons, Acadia's argument that ambiguity exists in the text of MEPL because the Legislature used the phrase "discriminate . . . on the basis of sex" is a nonstarter. The Maine and federal precedents outlined above reflect that the word discriminate does not automatically imply the existence of discriminatory intent. This basic understanding of anti-discrimination law has been on the books for 50 years. *See Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("Proof of discriminatory motive, we have held, is not required under a disparate-impact theory."); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 422 (1975) ("Title VII is not [exclusively] concerned with the employer's good intent or absence of discriminatory intent for Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." (quotation marks omitted)); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) ("practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices"). Not only is there no inherent expectation in the law that the prohibition against discrimination applies only to intentional discrimination, but also no indication in the text of MEPL that it is at all concerned with proof of discriminatory intent. Thus, even if there were some latent ambiguity to resolve here—because discrimination claims require proof of discriminatory intent in cases involving disparate *treatment*—the backdrop provided by Maine law, Law Court precedent addressed to disparate impact scenarios, and federal law addressed to disparate impact scenarios militate in favor of the

understanding that it is illogical to impose an intent requirement in a wage discrimination scenario. The evil redressed by MEPL is decidedly the impact of unequal pay for comparable work, regardless of the employer's motivation.[4]   Indeed, in the context of Maine wage law there is no precedent to suggest that non-payment or under-payment of wages could ever be excused by the employer's demonstration of a lack of intent to violate the law.

Finally, even if I were to search the depths of legislative intent as revealed in MEPL's legislative history, that history only reinforces the plain language construction I have been discussing. MEPL predates FEPA, and in its initial form, MEPL contained a catchall defense permitting pay differences based on "any reasonable differentiation except difference in sex." P.L. 1949, ch. 262, § 40-A. When the Legislature revised MEPL's wording two years after FEPA's passage, it removed this catchall defense. *See* P.L. 1965, ch. 150, § 628. At the same time, the Legislature ensured that two of the remaining affirmative defenses in MEPL were worded similarly to analogous affirmative defenses under the federal statute. *Compare* P.L. 1965, ch. 150, § 628 (excepting differences paid "pursuant to *established seniority systems* or *merit increase systems* or difference in the shift or time of the day worked") (emphasis added) *with* Equal Pay Act of 1963, Pub. L. No. 88-38, § 3, 77 Stat. 56, 57 (1963) (excluding differences paid "pursuant to (i) *a seniority system*; (ii) *a merit system*; (iii) a system which measures earnings by quantity or

---

[4] Acadia's purported defense, that male clinical psychologists were paid a negotiated fair market value, whereas female clinical psychologists were paid some sort of survey-based fair market value, ironically only reinforces Plaintiff's case.

quality of production; or (iv) a differential based on any other factor other than sex")
(emphasis added). That the Legislature declined to include a catchall defense in this
amended version of the law while borrowing other affirmative defenses from FEPA—and
in fact removed a catchall defense that had previously existed under MEPL—evinces a
design to ensure that the state law protected pay equality regardless of the employer's non-
discriminatory motive.[5] *Cf. City of Auburn*, 408 A.2d at 1261 (noting presumption that the
Legislature legislates "against the background of prior federal antidiscrimination statutes").
Moreover, the fact that MEPL was drawn against a legal backdrop that elsewhere
prohibited purposeful discrimination on the basis of sex reassures that the Legislature
meant to do away with that requirement in the specific context of pay disparity. Legislative
intent is expressed in the law as written, for all to see. Typically, a romp through the minds
of lawmakers is not the business of this Court when engaged in statutory construction; but
to the extent that it is possible or appropriate for a court to divine any Legislative "intent"
other than  that which is expressed through the words of the law, all available indicia show
that with MEPL, the Legislature said what it meant and meant what it said.

Nor does a plain text reading of MEPL lead to absurd results. While MEPL lacks
an intent requirement, the law leaves ample room for legitimate compensation differences
that happen to result in pay disparities between men and women. MEPL only applies where
employees perform "comparable work on jobs that have comparable requirements relating

---

[5] At the same time that the Legislature made these amendments to MEPL, it also revised MEPL's
requirement of "equal" work—the same requirement as under FEPA—to a more capacious requirement of
"comparable" work, further indicating an intent to ensure a more ambitious state law than its federal
counterpart. *See* P.L. 1965, ch. 150, § 628.

to skill, effort and responsibility," and even then creates affirmative defenses for pay differentials based on seniority, merit, and differences in shift or time of day. 26 M.R.S. § 628. Employers retain the ability to consider the broad spectrum of factors informing differences in compensation without running afoul of the statute. I acknowledge that my interpretation of MEPL will require employers to track compensation differentials among their employees and to articulate one of the authorized reasons provided by the statute for such pay disparity. This hardly impresses me as an absurd result of a pay equality statute. To the contrary, it strikes me as reasonable that the Legislature would impose the burden of knowledge of employee pay on the employers who do the paying rather than place employees in the untenable position to ferret out what their colleagues of the opposite sex are paid.

Construing MEPL thus, I conclude that Acadia has violated the statute as a matter of law, given the undisputed facts of record.

### 2. *Preemption*

Lacking a viable defense under MEPL's limited affirmative defense categories, Acadia attempts to invalidate MEPL with a perplexing preemption play. Acadia argues that MEPL does not apply in this case because it is preempted by various federal anti-fraud laws that govern billing for medical providers. According to Acadia, requiring hospitals to pay their female employees as much as their male employees doing comparable work would undermine the flexibility needed to tailor hospital employees' compensation in line with the complex regulatory regime governing payment for medical services created by

laws such as the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral Law, 42 U.S.C. 1395nn, and the False Claims Act, 31 U.S.C. §§ 3729.

But federal anti-fraud laws do not preempt MEPL.[6] Under the Supremacy Clause of the U.S. Constitution, Congress may pass legislation that preempts otherwise valid state laws. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). Precedents recognize "three different types of preemption—conflict, express, and field." *Id.* at 1480 (cleaned up). Neither express nor field preemption applies here—none of the federal anti-fraud statutes that Acadia cites expressly prohibit the enactment of equal pay laws, nor do any of the federal statutes completely occupy the field of medical wages in a manner that leaves no room for state legislation. *See id.* And while Acadia hangs its hat on a theory of conflict preemption, that theory is equally unavailing. Conflict preemption applies "where it is impossible for a private party to comply with both state and federal law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Here, neither obtains.

This is not a situation where compliance with both federal and state law is impossible—Acadia, like other employers in Maine, can comply with the requirements of both MEPL and federal anti-fraud laws. MEPL simply requires that employers provide

---

[6] In any event, Acadia waived its preemption defense by failing to raise it in the answer, as required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(c). Because an argument regarding preemption would bar recovery "even if the general complaint were more or less admitted to," preemption is an affirmative defense and so generally must be raised in the defendants' responsive pleading. *Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 449 (1st Cir. 1995).

equal pay to male and female employees who perform comparable work unless such pay disparity is authorized under the statute. 26 M.R.S. § 628. And it is plainly possible to pay women as much as men while, for example, avoiding the exchange of kickbacks or bribes, *see* 42 U.S.C. § 1320a-7b; avoiding self-referral by physicians, *see* 42 U.S.C. § 1395nn; and avoiding making false or fraudulent claims for payment, *see* 31 U.S.C. § 3729(a)(1)(A). It is also possible to pay women as much as men while ensuring that each employee's compensation reflects the fair market value of his or her services—indeed, providing comparable pay for comparable work is an essential element of any fair, "arm's length," market-based compensation structure. *See* 42 C.F.R. § 1001.952(d)(v). Milton Friedman will not roll over in his grave if Maine employers must abide MEPL in this fashion.

Nor is it the case that applying MEPL to large hospitals such as Acadia would pose an "obstacle" to achieving the purposes of federal anti-fraud laws. Acadia chiefly argues that adding another layer of regulation to an already-complex federal scheme would frustrate the balance struck by federal regulators. It cannot come as a surprise to Acadia that federal and state laws often combine to impose a complex and heavy regulatory burden. But that does not amount to preemption. And it is hard to see how, "under the circumstances of [this] particular case," MEPL "stands as an obstacle" to effectuating the purpose of anti-fraud laws. *Crosby*, 530 U.S. at 373 (quoting *Hines*, 312 U.S. at 67). Congress' apparent purpose in passing the Anti-Kickback Statute and Physician Self-Referral Law was to prevent fraud and waste in Medicare spending and other healthcare costs; Congress' purpose in passing the False Claims Act was more generally to prevent

17

fraud and ensure efficient government spending. Nothing in any of these federal laws evinces an intent to displace state wage laws. And while it is conceivable that *some* state wage law could lead to inefficient—though not fraudulent—healthcare spending, providing equal pay for equal work is decidedly not inefficient. Absent a credible showing that MEPL actually stands in the way of preventing wasteful or fraudulent healthcare spending, Acadia is left arguing that compliance with MEPL on top of anti-fraud laws would be too burdensome; but it is the role of state and federal legislators, not the unelected federal judiciary, to sort out that political argument.

Similarly, the fact that compliance with MEPL may make it difficult for Acadia to enjoy the protection of various federal statutory and regulatory safe harbors for "fair market" pay, *see, e.g.*, 42 U.S.C. § 1395nn(e)(2)(B)(i), does not mean that it is impossible or even difficult for Acadia to comply with both federal and state law. The safe harbors that Acadia cites are just that—legal carveouts that provide regulated entities with the knowledge that certain pre-approved billing practices will not open them up to a risk of litigation. Engaging in conduct that falls beyond a safe harbor does not necessarily amount to a violation of federal law. In some cases, courts have found preemption where state laws expressly sought to impose liability for conduct that federal law protected via safe harbor provisions. *See, e.g.*, *State v. Harden*, 938 So. 2d 480, 493 (Fla. 2006) (federal Anti-Kickback Statute preempted state analogue where state law did not recognize statutory safe harbors). But MEPL does not proscribe setting compensation based on "fair market value," 42 U.S.C. § 1395nn(e)(2)(B)(i)—to the contrary, it requires that the market value all

18

employees fairly, which naturally may lead to pay disparity if the basis for the disparity is authorized under the statute.

Acadia's attempt to set aside state wage protections in the name of market dynamics amounts to no more than statutory Lochnerism. MEPL is not preempted by any of the federal anti-fraud laws that Acadia cites.

### 3. *Availability of Treble Damages*

Because the record conclusively demonstrates that Acadia violated Plaintiff's rights under MEPL and because MEPL is not preempted by federal law, a legal issue of remedy arises. For reasons that follow, I conclude that Plaintiff is entitled to treble damages for her lost wages under 26 M.R.S. § 626-A.

Section 626-A sets out the penalties for violations of MEPL and certain other enumerated provisions of Maine's wage laws. Section 626-A authorizes two possible penalties: "forfeiture of not less than $100 nor more than $500 for each violation," and treble damages for any "unpaid wages or health benefits adjudged to be due." 26 M.R.S. § 626-A. On the statute's face, only the forfeiture clause obviously applies to violations of MEPL. However, the Law Court has held that the treble damages clause also applies to violations of any law listed in § 626-A to the extent that the employer is liable for "unpaid wages," because removing the possibility of treble damages "would strip" Maine's wage laws "of their effectiveness," *Cooper v. Springfield Terminal Ry. Co.*, 635 A.2d 952, 955 (Me. 1993). The Law Court has further clarified that the term "unpaid wages" includes instances where the employee was shorted—that is, not "paid in full"—as well as instances where the employee was stiffed altogether. *In re Wage Payment Litig.*, 2000 ME 162, ¶ 16,

759 A.2d 217. Thus while I am aware of no Maine court that has awarded treble damages for a violation of MEPL—presumably because MEPL has sparked precious few cases litigated to judgment—it is a natural entailment of Law Court precedent that Acadia is liable for treble damages based on the measure of wages Plaintiff was not paid but was legally entitled to under MEPL.

Relying on the Law Court's opinion in *In re Wage Payment Litigation*, Acadia argues that the amount owed to Plaintiff under MEPL is not an "unpaid wage," because Plaintiff has been paid. To start, section 626-A's grammar belies Acadia's argument—the statute authorizes treble damages for "unpaid wages," not "unpaid employees." 26 M.R.S. § 626-A. What's more, *In re Wage Payment Litigation* stands for a narrower proposition than Acadia suggests. That case involved a dispute over late wages, which the Law Court held did not classify as "unpaid" so long as any late wages were paid (1) upon the employee's demand, if the employee had already been terminated, or (2) by the next pay period, for current employees. *In re Wage Payment Litigation*, 2000 ME 162, ¶ 15, 759 A.2d 217. Because the wages owing to the employees in that case were eventually "paid in full," *id.* ¶ 16, they were not "unpaid." By contrast, Plaintiff has shown that, under MEPL, she was not "paid in full" during her time with Acadia; thus applying the Law Court's reasoning in *In re Wage Payment Litigation*, Plaintiff is owed unpaid wages under section 626-A.

Acadia contends that the Legislature cannot have intended the "absurd" result of imposing potentially massive liability on employers who, for years or even decades, paid female employees less than male employees without the employees' knowledge. But that

result is neither absurd nor inconsistent with the Legislature's aims. The purpose of section 626-A's treble damages provision is to provide effective deterrence against violations of Maine's wage laws. *See* L.D. 991, Statement of Fact (107th Legis. 1975). Underpayment of employees is notoriously hard to identify, thus absent the threat of significant liability, some employers would choose to undercompensate their employees and simply pay back the difference on the chance that they got caught. *See id.* (creating a "greater deterrent" for violations of wage laws because "[t]he penalty for failure to pay wages or earned vacation pay is too small to provide a deterrent to the employer who refuses or delays payment"). The record suggests that this is precisely the case with MEPL. Plaintiff, like many employees, was unaware of her colleagues' compensation for years. That Acadia avers to having been unaware of this difference only highlights why the Legislature chose to authorize treble damages under section 626-A and to apply that provision to MEPL. Absent the threat of heightened liability, employers would be incentivized not to investigate their compensation practices for MEPL compliance, knowing that they could simply pay back the difference if they were ever caught. And while employers' potential liability under section 626-A is certainly high, it is consistent with the scope of liability under the Maine Department of Labor's rules implementing MEPL insofar as those rules authorize both "civil enforcement action" by the Attorney General and "class-wide relief" for MEPL violations. 12-170 C.M.R. ch. 12, §§ III. Nor does it offend due process to impose treble damages for violations of a law that, like section 628, lacks an intent requirement. *See*

*Bisbing v. Maine Med. Ctr.*, 2003 ME 49, ¶ 7, 820 A.2d 582 (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 581–84 (1942)).

Accordingly, I conclude that section 626-A entitles Plaintiff to "unpaid wages" for the time that she was unlawfully underpaid by Acadia, plus "a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages." 26 M.R.S. § 626-A. Because neither party has provided facts to establish the amount of unpaid wages owing to Plaintiff, the proper measure of damages requires further proceedings.

## CONCLUSION

Defendants' Motion for Leave to File (ECF No. 28) is GRANTED. Defendants' Motion for Certification of Question of Law (ECF No. 28-1) is DENIED. Plaintiff's Motion for Partial Summary Judgment (ECF No. 13) is GRANTED.  Summary judgment will enter in favor of Plaintiff and against Defendant Acadia Hospital, Corp. on Count I of Plaintiff's Complaint.

**SO ORDERED.**

**Dated this 8th day of February, 2022.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE