# United States Court of Appeals
## For the First Circuit

No. 22-1394

CLARE E. MUNDELL,

Plaintiff, Appellee,

v.

ACADIA HOSPITAL CORP.,

Defendant, Appellant,

EASTERN MAINE HEALTHCARE SYSTEMS,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

Melissa A. Hewey, with whom Kasia S. Park and Drummond Woodsum were on brief, for appellant Acadia Hospital.

Valerie Z. Wicks, with whom Borealis Law, PLLC, David G. Webbert, and Johnson & Webbert, LLP were on brief, for appellee Clare E. Mundell.

Janna L. Gau, Kady S. Huff, and Eaton Peabody on brief for the Maine State Chamber of Commerce, amicus curiae.

Carol J. Garvan, Zachary L. Heiden, Anahita Sotoohi, ACLU of

Maine Foundation, Gillian Thomas, ACLU Foundation Women's Rights
Project, Sunu Chandy, and National Women's Law Center on brief for
the American Civil Liberties Union, American Civil Liberties Union
of Maine, and National Women's Law Center, amici curiae.

––––––––––––––––––––

February 1, 2024

––––––––––––––––––––

LIPEZ, **Circuit Judge**.  Paid half the rate earned by her male colleagues for comparable work as psychologists, appellee Clare Mundell brought this sex discrimination action against her former employer, Acadia Hospital ("Acadia"), under federal and state law.[1]  Ruling on Mundell's summary judgment motion, the district court found Acadia liable under the Maine Equal Pay Law ("MEPL"), Me. Stat. tit. 26, § 628, and awarded Mundell treble damages, see id. § 626-A.  On appeal, Acadia claims the district court erred in holding Mundell could prevail as a matter of law on her MEPL claim because Mundell did not establish Acadia's discriminatory intent and because Acadia asserted a viable reasonable-factor-other-than-sex affirmative defense to explain the pay differential between Mundell and her male colleagues.  The hospital further asserts that treble damages are not available for violations of the MEPL.

This case raises complex issues involving the construction of Maine law.  Acadia moved, both in the district court and on appeal, for certification of a two-part question to the Maine Supreme Judicial Court (the "Law Court"),[2] the answer to

---

[1] Eastern Maine Healthcare Systems ("Eastern Maine") was also named as a defendant but later dismissed.

[2] The Maine Supreme Judicial Court is referred to as the Law Court when it is sitting in its capacity as an appellate court and when it considers questions of state law referred to it by federal courts.  See Me. Stat. tit. 4, § 57 ("When it appears to the Supreme Court of the United States, or to any court of appeals or

which depends on whether discriminatory animus -- i.e., an intent
to discriminate -- is a required element of a MEPL claim.[3]  Like
the district court, however, we conclude that certification is
unnecessary.  We also agree with the district court's construction
of the relevant Maine statutes.  Accordingly, we affirm the
judgment and award of damages for Mundell.

**I.**

The facts relevant to the issues before us are
undisputed.  Mundell is a licensed clinical psychologist who, for

---

district court of the United States, that there is involved in any
proceeding before it one or more questions of law of this State,
which may be determinative of the cause, and there are no clear
controlling precedents in the decisions of the Supreme Judicial
Court, such federal court may certify any such questions of law of
this State to the Supreme Judicial Court for instructions
concerning such questions of state law, which certificate the
Supreme Judicial Court sitting as the Law Court may, by written
opinion, answer.").

[3] Acadia requests that we certify the following question
involving constructions of the MEPL and 26 M.R.S. § 628:

> Where an employer pays an employee at a rate
> less than another employee of the opposite sex
> who performs comparable work on a job with
> comparable requirements as to skill, effort,
> and responsibility for any reason other than
> an established seniority system, merit
> increase system, or difference in the shift or
> time of the day worked, does such conduct
> constitute a per se violation of the Maine
> Equal Pay Law, 26 M.R.S. § 628, entitling a
> plaintiff to recover treble damages and
> attorneys' fees pursuant to 26 M.R.S. § 626-
> A?

two and a half years beginning in 2017, was employed by Acadia, a nonprofit hospital in Bangor, Maine. Acadia employed a "pool" of five psychologists during this time, comprising two men and three women. Acadia paid the two male psychologists at a rate of $95 and $90 per hour, respectively, but paid the female pool psychologists around $50 per hour.

During a conversation with a fellow pool psychologist, Mundell learned that her male colleagues were paid more than her. Subsequently, she learned about other pay disparities between men and women in other jobs at Acadia. Believing the pay discrepancy between herself and her colleagues to be sex-based, she brought it to the attention of management. Around this time, Acadia independently became aware of several sex pay disparities among hospital employees and began a process to standardize pay across sexes. After a series of conversations between Mundell and Acadia in which the parties attempted to arrive at a mutually agreeable solution, Mundell informed Acadia on March 6, 2020, that she would be resigning, citing the differential between her wage and that of her male counterparts. Although she told Acadia she would work for two weeks after submitting her resignation to transition her patients, Mundell was informed on March 9, 2020, that she should not return to work after finishing the day.

The parties agree that all the pool psychologists, including Mundell, possessed the same fundamental qualifications

for the role: doctoral degrees and licenses to practice psychology in Maine, and comparable experience and skills in providing psychological services.  Acadia also concedes that it did not pay its pool psychologists differently pursuant to any seniority system, difference in shift or time of day worked, or merit increase system.  Instead, it says that a "'market-based' compensation structure" (hereinafter "market factors") explained any pay disparity between Mundell and her male colleagues.

Mundell filed an administrative complaint for state and federal sex discrimination and retaliation with the Maine Human Rights Commission, which also was cross-filed with the Equal Employment Opportunity Commission.  After exhausting the administrative process, she filed the instant action in federal court.  Mundell alleged that Acadia and Eastern Maine violated the MEPL by paying male and female employees different wages for "comparable work," Me. Stat. tit. 26, § 628; that Acadia and Eastern Maine's failure to provide equal pay amounted to sex discrimination in violation of the Maine Human Rights Act ("MHRA"), Me. Stat. tit. 5, § 4572(1)(A), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); and that Acadia and Eastern Maine committed unlawful retaliation by firing her after she complained of sex-based discrimination, in violation of Title VII, the MHRA, and the Maine Whistleblower Protection Act, Me. Stat. tit. 26, § 833(1)(A).

In September 2021, Mundell moved for partial summary judgment only on her MEPL claim against Acadia, asserting that the undisputed facts -- the acknowledged pay disparity for comparable work that Acadia admitted was not due to an established seniority system, merit pay system, or shift differences -- established Acadia's liability under the state's equal pay statute.  In opposing the motion, Acadia argued that this showing was insufficient for Mundell to prevail as a matter of law because the statute also required a showing of intent to discriminate, or, alternatively, Acadia should be permitted to raise the affirmative defense that it relied on a reasonable factor other than sex (i.e., market factors) to set these wages. Mundell countered that any requirement to establish discriminatory intent for the unequal pay would read an intent requirement into the text of the MEPL when there is none, and that market factors did not constitute a valid affirmative defense under the MEPL.  One day after the district court held oral argument on that motion, Acadia filed its Motion for Certification to the Law Court.

On February 8, 2022, the district court issued its decision addressing both the certification and partial summary judgment motions.  The district court first held that certification to the Law Court was inappropriate because the plain language of the MEPL, the statute's legislative history, comparable statutes and precedent, and public policy all provided more than enough

evidence of how the Law Court would likely resolve the issues of statutory interpretation raised by the parties. Mundell v. Acadia Hosp. Corp., 585 F. Supp. 3d 86, 90-91 (D. Me. 2022). The district court then analyzed the MEPL's statutory language (viewing it as plain and unambiguous); applicable case law under the Federal Equal Pay Act ("FEPA"), 29 U.S.C. § 206(d), and similar state statutes (viewing them as analogous); and the MEPL's legislative history (viewing it as instructive). See Mundell, 585 F. Supp. 3d at 91-95.

The court concluded that this material compelled the following holdings: (1) the MEPL does not impose an intent requirement on a plaintiff, nor does it permit a defendant to rely on a catch-all affirmative defense (i.e., claiming that pay differences are based on "any reasonable differentiation except difference in sex") because the MEPL explicitly limits affirmative defenses to pay differentials based on seniority, merit, or differences in shift/time of day worked, id. at 92-94 (concluding that "the act of paying unequal wages for comparable work establishes discrimination on the basis of sex under the [MEPL]," and refusing to "will into existence by judicial fiat a catchall affirmative defense that does not exist in the text of the law"); and (2) those who violate the MEPL can be obligated to pay treble damages, id. at 99 (analyzing Me. Stat. tit. 26, § 626-A).

The parties then filed a Joint Stipulation of Dismissal with Prejudice of Mundell's Title VII and MHRA claims against Acadia as well as all of Mundell's claims against Eastern Maine. The district court entered a judgment of dismissal in accordance with the parties' stipulation.  It also entered judgment against Acadia and in favor of Mundell for a violation of the MEPL and awarded Mundell $180,955.90 (the damages she requested in full). This judgment was a final judgment and disposed of all of Mundell's claims.

In addition to filing its appeal, Acadia asked us to certify to the Law Court the same question involving statutory construction it had raised before the district court.  We denied the motion without prejudice to consider along with the merits of the appeal.  Acadia also seeks review of the district court's grant of partial summary judgment, arguing that the court erred in its construction of Maine law by: (1) holding that a plaintiff need not show an intent to discriminate to succeed with a claim under the MEPL, and that, in so concluding, the court also incorrectly read the MEPL to have only limited affirmative defense categories; and (2) holding that treble damages are available for MEPL violations.

## II.

We review an order granting summary judgment de novo. <u>Benson</u> v. <u>Wal-Mart Stores E., L.P.</u>, 14 F.4th 13, 17 (1st Cir.

2021).  The interpretation of a statute or regulation, which presents a purely legal question, is likewise subject to de novo review.  O'Connor v. Oakhurst Dairy, 851 F.3d 69, 71 (1st Cir. 2017).

## A. Certification

When faced with potentially outcome-determinative questions of Maine law for which "there is no clear controlling precedent in the decisions of the Supreme Judicial Court," a federal court may certify those questions to the Law Court "for instructions" on how to rule.  Me. R. App. P. 25.  However, "a federal court . . . should not simply throw up its hands but, rather, should endeavor to predict how that court would likely decide the question."  Butler v. Balolia, 736 F.3d 609, 612-13 (1st Cir. 2013) (citing In re Bos. Reg'l Med. Ctr., Inc., 410 F.3d 100, 108 (1st Cir. 2005)).  Indeed, we should not "bother our busy state colleagues with every difficult state-law issue that comes our way," Plourde v. Sorin Group USA, Inc., 23 F.4th 29, 36 (1st Cir. 2022) (citing Patel v. 7-Eleven, Inc., 8 F.4th 26, 29 (1st Cir. 2021)), particularly in cases where "state law is sufficiently clear to allow us to predict its course."  In re Engage, Inc., 544 F.3d 50, 53 (1st Cir. 2008) (emphasis added) (observing that "certification would be inappropriate" in such cases "even in the absence of controlling precedent").  Moreover, as our circuit colleague long ago recognized, not only does certifying questions

- 10 -

"add to the workload of the responding court," it also places a burden of time and expense on parties asked to redevelop, re-brief, and reargue the same issue multiple times in different fora. Hon. Bruce M. Selya, Certified Madness: Ask a Silly Question . . ., 29 Suffolk U. L. Rev. 677, 682, 689-90 (1995).

Here, the district court denied certification because "'the plain language of the statute, legislative history and public policy[] all' point in the same direction and make the correct constructions of [the] MEPL and § 626-A sufficiently clear." Mundell, 585 F. Supp. 3d at 91 (quoting Int'l Ass'n of Machinists & Aerospace Workers v. Verso Corp., 121 F. Supp. 3d 201, 227 (D. Me. 2015)). We agree with the thoughtful analysis of the district court. As our discussion below demonstrates, certification is unnecessary and inappropriate because the factors cited by the district court, which the Law Court also would consider, provide us with ample guidance.

## B. The MEPL and "Intent to Discriminate"

When asked to determine the meaning of a Maine statute that the Law Court has not yet interpreted, we "predict 'how that court likely would decide the issue.'" Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011) (quoting González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318-19 (1st Cir. 2009)). When interpreting a statute, Maine courts "give effect to the Legislature's intent by considering the statute's plain meaning

- 11 -

and the entire statutory scheme of which the provision at issue forms a part." Scamman v. Shaw's Supermarkets, Inc., 157 A.3d 223, 229 (Me. 2017) (quoting Samsara Mem'l Tr. v. Kelly, Remmel & Zimmerman, 102 A.3d 757, 771 (Me. 2014)).  "Only if the plain language of the statute is ambiguous" should courts "look beyond [it] to examine other indicia of legislative intent, such as legislative history." Id.  The Law Court also has stressed that "[n]othing in a statute may be treated as surplusage if a reasonable construction applying meaning and force is otherwise possible." State v. Murphy, 130 A.3d 401, 404 (Me. 2016) (alteration in original) (quoting State v. Lowden, 87 A.3d 694, 697 (Me. 2014)); see also State v. Dubois Livestock, Inc., 174 A.3d 308, 311 (Me. 2017) ("We reject interpretations that render some language mere surplusage." (quoting Dickau v. Vt. Mut. Ins. Co., 107 A.3d 621, 628 (Me. 2014))).

The MEPL provides in relevant part[4]:

> An employer may not discriminate between employees in the same establishment on the basis of sex by paying wages to any employee in any occupation in this State at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable

---

[4] As of October 25, 2023, an amended version of the MEPL codified at Me. Stat. tit. 26, § 628 also prohibits pay discrimination on the basis of race.  We rely on the prior version of the statute in effect at the time Mundell filed suit, which contains identical language with respect to sex-based discrimination and affirmative defenses but did not include the prohibition on race-based pay discrimination.

> work on jobs that have comparable requirements
> relating to skill, effort and responsibility.
> Differentials that are paid pursuant to
> established seniority systems or merit
> increase systems or difference in the shift or
> time of the day worked that do not
> discriminate on the basis of sex are not
> within this prohibition.

Me. Stat. tit. 26, § 628.  Because the parties agree that Acadia paid Mundell and the other female psychologists less than it paid the male psychologists, and that these employees all occupied the same job and performed comparable work to one another, the undisputed facts of this case arguably establish -- as Mundell has asserted -- the core elements of a MEPL claim.  Acadia has further acknowledged that these pay differences resulted from something other than an established seniority system, merit pay system, or shift differences.  Hence, the MEPL's three enumerated affirmative defenses do not on their face shield Acadia from MEPL liability.

Acadia argues, however, that the district court wrongly concluded that the undisputed facts were sufficient to establish Acadia's liability under the MEPL as a matter of law.  Specifically, Acadia says the district court incorrectly construed the MEPL to be a law of strict liability, namely "read[ing]" out of the liability portion of the statute "the words 'discriminate' and 'on the basis of sex.'"  Under this flawed construction, Acadia asserts, "an employer who pays employees different rates of pay on the basis of their geographic assignments, their ability to

generate business, their willingness to relocate, or any number of legitimate business reasons, is deemed to have discriminated against the lower paid employee simply because the two employees happen to be of different sexes." Acadia claims that reading the statute to exclude an intent element, in combination with reading the statute to provide only the three listed affirmative defenses, would have devastating practical consequences for Maine businesses surely not intended by the Maine Legislature.

Mundell insists, as the district court concluded, that the provision unambiguously imposes liability for established (or admitted to) pay differences between male and female employees for comparable work in comparable jobs without regard to the employer's intent, and allows as defenses only the three specified, facially sex-neutral rationales for the challenged pay disparity so long as those practices do not, in fact, arise from sex-based discrimination.

Thus, the questions before us are: (1) whether Acadia's liability under the MEPL depends on a finding that its unequal treatment of male and female psychologists resulted from discriminatory intent, a factual issue that would need to be explored on remand; and (2) whether Acadia can justify the pay disparity, and avoid liability, based on a sex-neutral rationale that is not one of the three affirmative defenses identified in the MEPL, another issue that would need factual development and

foreclose summary judgment for Mundell.

### 1.  Plain Language of the Statute

As described above, Acadia's primary textual argument is that "on the basis of sex" in the first sentence of the MEPL inescapably means "because of sex" -- i.e., liability attaches only if the employer is intentionally paying one group of employees less "because of" their sex.  Acadia further argues that, even if we conclude that the liability portion of the statute does not include intent as an element, Mundell still cannot prevail on her MEPL claim as a matter of law because the statute's second sentence contemplates affirmative defenses based on virtually any reasonable, non-sex-based explanation for the challenged pay differential.[5]

Acadia's construction of the MEPL does not withstand careful review.  Like the district court, we conclude that Mundell's reading is the only reasonable interpretation of the MEPL's text and, hence, that the statute is unambiguous.  See Scamman, 157 A.3d at 229 ("Statutory language is considered ambiguous if it is reasonably susceptible to different interpretations." (quoting Zablotny v. State Bd. of Nursing, 89

---

[5] Acadia seems to qualify its view by accepting that employers could not defend against liability by invoking illegitimate, arbitrary, or unreasonable rationales for a sex-based differential in pay.

A.3d 143, 148 (Me. 2014))); cf. Bloate v. United States, 559 U.S. 196, 208 (2010) (observing that statutory interpretation is not undermined simply because the statute is "amenable to another interpretation").

That is not to say the MEPL's language is straightforward. A statute's complexity, however, does not necessarily render it ambiguous. See, e.g., Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019) (noting that "a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read"); Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) ("The statute is awkward, and even ungrammatical; but that does not make it ambiguous . . . ."); Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 707 (1991) (Scalia, J., dissenting) (declaring that a text is not ambiguous merely because "discerning the only possible interpretation requires a taxing inquiry").

The district court tackled the interpretive challenge posed by the MEPL. As the court carefully explained, the provision's first sentence is plainly a statement of liability -- that is, the sentence describes when an employer will be found in violation of the MEPL's prohibition on discrimination: "An employer may not discriminate between employees . . . on the basis of sex by paying [unequal wages] for comparable work . . . ." Me. Stat. tit. 26, § 628 (emphasis added). If an employer does what is described after the word "by" -- i.e., the employer pays unequal

wages to male and female employees for comparable work in jobs with comparable requirements -- the employer is, under the statutory definition, discriminating on the basis of sex.  We agree with the district court that this language provides no role for the employer's motivation.   The sentence states, without qualification, that it is the unequal pay, not the reasons for it, that constitutes the impermissible discrimination.[6]

Reading the MEPL's liability sentence to exclude a requirement of intent is further compelled when that sentence is viewed alongside the statute's next sentence specifying certain permissible employer defenses to liability.  As the district court observed, if the MEPL required proof of intent to establish liability, it would necessarily follow that virtually <u>all</u> policies or systems of pay disparity between men and women not rooted in

---

[6] The fact that state and federal antidiscrimination statutes with substantively similar or identical language permit plaintiffs to raise disparate impact claims further bolsters this point.  For example, Title VII prohibits discrimination "because of" a protected trait and has been interpreted to proscribe not only intentional discrimination, but also facially neutral practices that disparately impact members of a certain class regardless of the employer's underlying motivation.  <u>See</u> <u>Albemarle Paper Co.</u> v. <u>Moody</u>, 422 U.S. 405, 422 (1975) ("Title VII is not [exclusively] concerned with the employer's 'good intent or absence of discriminatory intent[,]' for 'Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation.'" (quoting <u>Griggs</u> v. <u>Duke Power Co.</u>, 401 U.S. 424, 432 (1971))).  Likewise here, the phrase "discriminate ... on the basis of sex" cannot reasonably be construed to prohibit only intentional discrimination as Acadia insists.

intentional sex discrimination would fall outside the reach of the MEPL.  See Mundell, 585 F. Supp. at 93.  But the MEPL's second sentence negates any such interpretation of the statute.

The MEPL's second sentence reads: "Differentials that are paid pursuant to established seniority systems or merit increase systems or difference in the shift or time of the day worked that do not discriminate on the basis of sex are not within this prohibition."  Me. Stat. tit. 26, § 628.  Mundell argues that construing the MEPL's first sentence to include an intent requirement would effectively incorporate an unwritten "catch-all defense" into the statute, defeating claims where employers point to any legitimate rationale other than intentional sex discrimination to explain the pay disparity.  Indeed, that is, in essence, what Acadia asks us to do when it asserts that its market factors rationale is a legitimate defense to MEPL liability.

But if the statute's first sentence had an intent requirement, these three affirmative defenses would be mere illustrations of reasons for pay differentials that do not constitute intentional sex discrimination.  There is no textual evidence, however, to read these affirmative defenses as examples or parts of a non-exhaustive list (e.g., "including" or "such as").  See Lee v. Massie, 447 A.2d 65, 68 (Me. 1982) ("Because the Maine Legislature omitted such language indicating the illustrative nature of its earlier definitional formulation ... we conclude

that [it] intended [the provision] to constitute a comprehensive and exclusive definition."); cf. Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 162 (2012) (observing that the use of the word "includes" is "significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive"); United States v. Daniells, 79 F.4th 57, 69 (1st Cir. 2023) ("The use of the word 'includes' in the statutory definition . . . indicates . . . that the definition . . . encompasses more than [the two items listed]."); Carroll v. Trump, 49 F.4th 759, 768-69 (2d Cir. 2022) (noting that the word "includes" suggests that the subsequent examples are illustrative, not exhaustive).[7] Consequently, the MEPL's plain text forecloses Acadia's attempt to invoke a broader reading of the statute's second sentence.

Moreover, the three affirmative defenses chosen by the Maine Legislature are logical exceptions to the MEPL's otherwise all-encompassing prohibition against sex-based pay differentials. Seniority and merit-increase systems, as well as variations in working hours or conditions, are well-established and well-known bases for wage differentials. See, e.g., Corning Glass Works v.

---

[7] In suggesting that the MEPL's second sentence could be serving such an illustrative or clarificatory purpose, the dissent refers to these enumerated affirmative defenses as "safe harbors." That nomenclature, whatever its purpose, does not alter our analysis.

Brennan, 417 U.S. 188, 204 (1974) (discussing night-shift scheduling); 29 U.S.C. § 206(d) (specifying seniority and merit systems among the acceptable reasons for pay differentials under the FEPA). There is nothing implausible about insulating just those three types of employment practices -- and not others -- from MEPL liability.

It is also significant that the MEPL's second sentence contains a limitation: the three enumerated pay practices will shield an employer from MEPL liability only if their use in a particular instance, though resulting in a difference in pay across sexes, was not motivated by an employee's sex. See Me. Stat. tit. 26, § 628.[8] If the grounds for liability set forth in the first sentence of the MEPL required a showing of intent, there would be no need for the second sentence to state that the "established

---

[8] The logic of that qualification can be illustrated through the paradigmatic circumstances presented in Corning Glass Works v. Brennan, 417 U.S. 188 (1974), a case brought under the FEPA. The Court rejected pay disparities based on facially neutral criteria if they resulted from a history of paying women less than their male counterparts. See id. at 196-97, 204, 209-10. The Court explained that, if a company believed that women were incapable of working the night shift and therefore allowed only men to work that shift for higher pay, the company could not then claim protection under the affirmative defense of "a difference in the shift or time of the day worked" because the employer's discriminatory intent shaped the shift distribution in the first place. See id. at 196-97 (reasoning that the FEPA contemplates that a male night shift worker may receive a higher wage than a female day worker but only if that pay differential was due to the difference in the time worked and not because of sex).

seniority systems," "merit increase systems," and "differences in the shift or time of the day worked" only provide a defense to MEPL liability if they themselves "do not discriminate on the basis of sex." Id.    The question of whether the system or shift differential resulted from the employer's discriminatory motivation would already have been answered.

Hence, as the district court concluded, the only reasonable construction of the MEPL is that liability attaches with proof that employees of one sex are being paid less than employees of another sex for comparable work in comparable jobs, regardless of intent,[9] unless an employer can demonstrate that the disparity stems from the second sentence's three listed exceptions -- and, even then, only if those excepted practices are not traceable to purposeful sex-based discrimination.

We recognize that this construction of the MEPL results in our reading the statute's first use of the phrase "discriminate . . . on the basis of sex" differently from its second use of the same phrase.    But that difference does not undermine our

---

[9] Establishing each of these elements is no easy threshold for a plaintiff to meet.  As the district court recognized, what may be most unusual about this case was Acadia's willingness to concede, for the purposes of summary judgment, that Mundell performed "comparable work" on a job that had "comparable requirements relating to skill, effort, and responsibility" as her male peers but received different pay than her male peers. Mundell, 585 F. Supp. 3d at 95.

construction of the MEPL.  In the first sentence, the job of "discriminate . . . on the basis of sex" is simply to define the prohibited discrimination.  In the second sentence, which identifies three practices that may involve permissible pay differentials between the sexes, the job of the phrase is to narrow the carve-out to only those seniority systems, merit systems, and shift differentials that do not mask discriminatory motivation. The phrase plainly has a different purpose in each sentence of the MEPL, and we think it is both appropriate and permissible to construe it differently as required by those differing contexts.

We are well aware, as the dissent argues, that there is a presumption that the same words in the same statute have the same meaning. See Sullivan v. Stroop, 496 U.S. 478, 484 (1990) ("Identical words used in different parts of the same act are intended to have the same meaning." (cleaned up)); Att'y Gen. v. Sanford, 225 A.3d 1026, 1030-31 (Me. 2020) (nearly identical statutory language demonstrates legislative intent to establish rights judged on equivalent terms).  But that presumption "is not rigid."  United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 213 (2001).  The presumption has limits because "[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section."  Env't Def. v. Duke Energy Corp., 549 U.S. 561, 574

(2007) (alteration in original) (quoting Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)).

Thus, the principle that a word ordinarily should be given the same meaning each time it is used within the same statute "readily yields" whenever the context demands a different conclusion -- i.e., when it is only reasonable to conclude that the same word or phrase was used differently in different parts of the statute. See Gen. Dynamics Land Sys., Inc., v. Cline, 540 U.S. 581, 595-97 (2004) (quoting Atl. Cleaners & Dyers, Inc., 286 U.S. at 433). That is the situation that exists in the MEPL. Cf. Cleveland Indians Baseball Co., 532 U.S. at 213 (noting that the phrase "wages paid" has different meanings in different parts of the statute); Robinson v. Shell Oil Co., 519 U.S. 337, 343-344 (1997) (noting that the term "employee" has different meanings in different parts of Title VII); Senty v. Bd. of Osteopathic Examination & Registration, 594 A.2d 1068, 1071 (Me. 1991) ("We must conclude that the Legislature did not intend unreasonable or absurd consequences, or results inimical to the public interest, and must interpret a statute to avoid such contradictions."); Pub. Serv. Co. of N.H. v. Assessors of Town of Berwick, 183 A.2d 205, 208 (Me. 1962) ("Statutory canons and rules of interpretation are helpful, necessary, time-tested and revered but are to be judiciously consulted and applied.").

Thus, though the dissent characterizes this reading of

the statute's plain language as internally "contradictory," we disagree.  Statutory construction is always contextual, and here we are giving the words the meanings derived from their differing contexts within the same statutory provision.  A narrowly applied intent requirement in the context of a limited number of affirmative defenses is fully consistent with a liability provision that generally bars both intentional and unintentional sex-based differences in pay.

The dissent further suggests that our reading of the statute impermissibly results in "superfluous" language because the liability provision's use of the phrase "discriminate . . . on the basis of sex" is "seemingly unnecessar[y]" to accomplish the statute's anti-discrimination objective.  Acadia similarly argues that a reading of the MEPL that excludes a requirement of intentional discrimination impermissibly "deletes" that phrase from the statute's first sentence.  Their view, in other words, is that the statute -- if intent is not an element -- could have been drafted more simply to say only that employers were prohibited from "paying wages to any employee . . . at a rate less than the rate at which the employer pays any employee of the opposite sex." Me. Stat. tit. 26, § 628.  Hence, the statute's express bar against discriminating "on the basis of sex" -- if it does not require intent -- is arguably redundant.  Such redundancy, according to Acadia and the dissent, is incompatible with the Law Court's strong

and consistent rebuke of any statutory readings yielding "surplusage." See, e.g., Dubois Livestock, Inc., 174 A.3d at 311.

Acadia and the dissent, however, are drawing a false equivalence with these contentions. They seemingly take the view that words that are arguably unnecessary in a statute are equivalent to the "mere surplusage" disavowed by the Law Court. The canon of surplusage does not sweep so broadly. In interpreting statutory text, courts instead are instructed to think more pragmatically:

> If possible, every word and every provision is to be given effect (verba cum effectu sunt accippienda). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.

Justice Antonin Scalia & Bryan A. Garner, A Dozen Canons of Statutory and Constitutional Text Construction, 99 Judicature 2 (2015) (reciting the "canon of surplusage"). We adhere closely to that instruction here.

First, we are neither ignoring nor otherwise rendering inconsequential the statute's first use of the phrase "discriminate . . . on the basis of sex." Instead, we ascribe to the phrase definite meaning, explaining its role in defining the prohibited discrimination. Cf. Chickasaw Nation v. United States, 534 U.S. 84, 97-98 (O'Connor, J., dissenting) (noting that statutory language is not "mere surplusage," even when redundant,

if and when "it means something").  Indeed, our dissenting colleague acknowledges the "useful function" for the phrase in the liability sentence: the words could serve the expressive function of "clarifying" that the conduct following the word "by" is "itself a type of 'discriminat[ion] . . . on the basis of sex.'"  A "useful" reading -- even if "seemingly unnecessar[y]" or merely "clarifying," as minimized by the dissent -- is surely a "reasonable construction" that is consistent with Maine precedent.  See Lowden, 87 A.3d at 697 (stressing that "[n]othing in a statute may be treated as surplusage if a reasonable construction applying meaning and force is otherwise possible" (quoting State v. Harris, 730 A.2d 1249, 1251 (Me. 1999))).

Second, and critically, our reading retains the meaning of the MEPL's second sentence in its entirety.  As we have explained, if no intent means no liability, an employer could assert any reasonable non-sex-based rationale for a differential in pay to shield itself from MEPL liability -- creating an unwritten catch-all affirmative defense that would be at odds with the second sentence's circumscribed exceptions to liability.  Maine law does not indulge such conflicts.  Emphasizing this very point, the Law Court recently rejected a proposed reading of the word "designated" in a state statute that "would eviscerate" the meaning of another phrase in the same statute.  See Sanford, 225

A.3d at 1030-31.  In sum, "we will not interpret a statute in such a way as to render some words meaningless."  Id. at 1031.

We thus reiterate that, as a matter of the statute's plain and unambiguous language, the MEPL's liability provision does not incorporate an intent element, and its affirmative defenses are limited to those specifically enumerated.  Although not essential for that holding, we find additional support for the plain meaning of the statute in the evident discord between Acadia's asserted reading of the MEPL and comparable statutes, precedent, and legislative history.  We turn to that confirming material.

### 2.   Comparable Statutes & Precedent

As both Mundell and the district court point out, federal and state courts have read the phrase "discriminate on the basis of" in similarly structured anti-discrimination statutes to not require intent.  See, e.g., Corning Glass Works, 417 U.S. at 196 (construing the FEPA); Jancey v. Sch. Comm. of Everett, 658 N.E. 2d 162, 170 (Mass. 1995) (construing the Massachusetts Equal Pay Act); Vt. Hum. Rts. Comm'n v. Vt. Dep't of Corr., 136 A.3d 188, 195-96 (Vt. 2015) (construing the Vermont equal pay law).  Case law interpreting this phrase in other statutes thus serves to reinforce our reading of the MEPL's plain text and undermines Acadia's argument that "discriminate . . . on the basis of" may only be reasonably read to mean "because of" sex, thus requiring

discriminatory intent.

### a. FEPA

We start with the federal analog to the MEPL, the FEPA, and the caselaw construing it. See Gordon v. Me. Cent. R.R., 657 A.2d 785, 786 (Me. 1995) (reasoning that when the Law Court has not yet interpreted a statute, "Maine courts may look to analogous federal statutes, regulations, and case law for guidance"). When the Law Court looks to relevant federal authority, it does so only "when the federal and state laws are substantially identical," and otherwise construes Maine discrimination laws to give effect to any differences. Scamman, 157 A.3d at 233 (quoting Percy v. Allen, 449 A.2d 337, 342 (Me. 1982)).

Although the 1949 MEPL[10] predates the FEPA, the Maine

---

[10] The final 1949 text read as follows:

> Sec. 40-A. Wage rates for equal work; penalty; exception.    No employer shall employ any female in any occupation within this state for salary or wage rates less than the salary or wage rates paid by that employer to male employees for equal work. However, nothing in this section shall prohibit a variation in salary or wage rates based upon a difference in seniority, experience, training, skill, ability, or difference in duties or services performed, either regularly or occasionally, or difference in the shift or time of the day worked, or difference in availability for other operation, or other reasonable differentiation except difference in sex. Any individual, association or corporation who violates the provisions of this section shall

Legislature amended the MEPL in 1965 -- shortly after the FEPA's passage in 1963 -- with the resulting, refurbished state statute noticeably resembling its federal counterpart both in how it defined the proscribed conduct and in how it set forth available defenses. See Elizabeth J. Wyman, The Unenforced Promise of Equal Pay Acts: A National Problem and Possible Solution from Maine, 55 Me. L. Rev. 23, 26 (2003) (comparing P.L. 1965, ch. 150, U.S.C. § 628 with Equal Pay Act of 1963, Pub. L. No. 88-38, § 3, 77 Stat. 56, 57 (1963)).[11] Since 1965, the MEPL and the FEPA have continued to share this same structure as well as the key statutory language in their liability provisions: employers may not "discriminate" "between employees" in the same establishment "on the basis of

---

be punished by a fine of not more than $ 200.

Me. Pub. L. 1949, ch. 262, § 40-A.

[11] In relevant part, the FEPA states:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d).

sex" "by" paying lower wages to "employees of the opposite sex" for work that is comparable (under the Maine law) or equal (under the federal law), unless an enumerated exception applies.  Compare Me. Stat. tit. 26, § 628 with 29 U.S.C. § 206(2)(1); see also Wyman, supra, at 42-43.

It has long been established that the FEPA does not require any showing of intent.  See, e.g., Corning Glass Works, 417 U.S. at 196.  As the MEPL "generally track[s]" the FEPA's liability provision, the case law interpreting the FEPA "provide[s] significant guidance in the construction" of the state law.  See Me. Hum. Rts. Comm'n v. City of Auburn, 408 A.2d 1253, 1261 (Me. 1979) (quoting Me. Hum. Rts. Comm'n v. Local 1361, Me., 383 A.2d 369, 375 (Me. 1978)).

What is more, the textual differences between the MEPL and the FEPA evince an intent to make the MEPL more protective than its federal counterpart, not less so.  The FEPA uses an "equal" work standard while the MEPL applies to "comparable" work -- a more capacious concept.[12]  Given this broader protection for employees in the MEPL, it would be particularly odd to read an intent requirement that does not exist in the FEPA into the MEPL's

---

[12] The parties agree that the comparable work standard is broader than the equal work standard.  Massachusetts courts have also been clear that the comparable work standard in that state's equal pay law is more protective than the equal pay standard in the FEPA.  See Jancey, 658 N.E.2d at 167; Wyman, supra, at 42-43.

liability provision.

The dissent contends that there are simply too many differences between the substance and structure of the two statutes for the FEPA, and precedents interpreting the statute, to be seen as comparable and instructive in our interpretation of the MEPL's plain text. In particular, the dissent draws significance from the fact that the MEPL's liability provision and its affirmative defense provision are separated into two distinct sentences, whereas the FEPA's are combined into one sentence separated by the word "except." The dissent also points to the MEPL's duplicate use of the phrase "discriminate . . . on the basis of sex" compared to the FEPA's single use.

But state discrimination laws need not be perfectly congruent with federal counterparts for courts to look to those federal statutes for guidance -- particularly when the state statute, as is the case here, "generally track[s]" the federal analogue. City of Auburn, 408 A.2d at 1261. Moreover, departing from the settled understanding that the FEPA does not contain an intent requirement to conclude that intent is required for liability under the MEPL would give notably different meanings to the very similar liability provisions in the state and federal laws. The dissent's proposed reading therefore creates a large gap between the two statutes in disregard of their textual parallels.

By contrast, our reading both preserves the equivalence between the state and federal statutes' substantive liability provisions and recognizes the substantial differences in their affirmative defense provisions. Although the FEPA, like the MEPL, enumerates several specific affirmative defenses, the federal statute, unlike the MEPL, goes on to provide a catch-all affirmative defense ("a differential based on any other factor other than sex," 29 U.S.C. § 206(d)). In addition, as we have explained, the MEPL qualifies its enumerated affirmative defenses with the requirement that they not stem from sex-based discrimination, whereas the FEPA does not include that limitation. Compare id., with Me. Stat. tit. 26, § 628.

The significance we draw from the equivalence between the state and federal statutes' nearly identical liability provisions is not diminished by the differences in their handling of affirmative defenses. By contrast, Acadia's reading of the MEPL, echoed by the dissent, reads the MEPL and FEPA's affirmative defense provisions to have the same scope, implausibly ignoring the two statutes' obvious textual differences.[13]

---

[13] Our dissenting colleague accuses us of overstating the influence of the FEPA on the MEPL's language, suggesting that we are overreaching when we assign meaning to the differences between the federal and state laws as well as to their similarities. To the contrary, we are simply reading text, giving indisputable meaning to similar language in the liability provisions and dissimilar language in the affirmative defense provisions.

### b.    Comparable State Pay-Equity Statutes

Our reading also is reinforced strongly by analogous pay-equity statutes from other states.  Indeed, our holding that discriminatory intent is not a required element of viable wage discrimination claims in Maine conforms with the consensus view of state and federal courts throughout the country.

Nearly thirty years ago, for example, the Massachusetts Supreme Judicial Court ("SJC") read the Massachusetts Equal Pay Act ("MEPA") to not require proof of an employer's discriminatory intent to establish liability.  Like the MEPL, the MEPA has a liability provision followed by an affirmative defenses provision.  The MEPA's liability provision similarly prohibits employers from "discriminat[ing] . . . in the payment of wages as between the sexes" and "pay[ing] any person [a lesser wage] than the rates paid to employees of the opposite sex for [like or comparable work]."  See Jancey, 658 N.E.2d at 165-66 (quoting Mass. Gen. Laws ch. 149, § 105A (1994)).[14]  Construing this language, the SJC held that "the plain language of the statute does not require a finding

---

[14] According to the Jancey court, at that time, the 1994 MEPA contained just one enumerated affirmative defense (seniority systems) but had no enumerated "catch-all" affirmative defense.  The present-day MEPA by contrast contains numerous enumerated affirmative defenses, including seniority and merit systems, but continues to not incorporate into its plain language that an employer can permissibly assert an any-reasonable-factor-other-than-sex catch-all affirmative defense.  Compare Jancey, 658 N.E.2d at 170, with Mass. Gen. Laws ch. 149, § 105A (2018).

of purposeful discrimination." Id. at 170.[15]

Applying similar logic to that of the SJC, a wide variety of state courts have likewise read their own pay-equity laws -- with liability provisions akin to (even if not identical to) the MEPL and the FEPA in both wording and structure -- to not require proof of an employer's discriminatory intent to establish liability. See, e.g., Vt. Hum. Rts. Comm'n, 136 A.3d at 196 (discriminatory intent is not a required element of state equal pay statute); Green v. Par Pools, Inc., 3 Cal. Rptr. 3d 844, 847-49 (Cal. Ct. App. 2003) (same); Kolstad v. Fairway Foods, Inc., 457 N.W.2d 728, 734 (Minn. Ct. App. 1990) (same). Several more state courts have held that claims brought under their own pay-equity statute ought to be analyzed identically to FEPA claims -- which, as discussed, has no malintent requirement -- despite various differences in phrasing in their respective liability or

---

[15] Just as Acadia does here, the Massachusetts employer in Jancey had contended that a MEPA violation should include an intent element even though the FEPA does not. The employer argued that "the lack of an intent requirement in [the] FEPA is equitable because [the FEPA] contains several affirmative defenses, including a broad catch-all defense," whereas the MEPA contains only one affirmative defense. Jancey, 658 N.E.2d at 170. Hence, to be equitable, "the [Massachusetts] Legislature" must have "intended to restrict the [MEPA] to purposeful acts." Id. Rejecting the argument that an intent element should be inferred "based on the dearth of affirmative defenses [in the MEPA]," the SJC instead held that "the statute on its face creates a form of strict liability" whenever an employer pays "members of one sex . . . at a lower rate than members of the opposite sex for work of like or comparable character." Id.

- 34 -

affirmative defense provisions. See, e.g., Paris-Purtle v. State, No. X10UWYCV146025212, 2015 WL 5622517, at *4 (Conn. Super. Ct. Aug. 14, 2015) (state pay act construed like the FEPA); Adams v. Univ. of Wash., 722 P.2d 74, 77 (Wash. 1986) (same); Hudon v. W. Valley Sch. Dist. No. 208, 97 P.3d 39, 43 (Wash. Ct. App. 2004) (same). Federal courts have also uniformly read pay-equity statutes from a variety of states to not require discriminatory intent. See, e.g., Spiewak v. Wyndham, Inc., No. 20-13643, 2023 WL 869309, at *5 (D.N.J. Jan. 26, 2023); Reynolds v. Stovall, No. 11-04006, 2012 WL 1202026, at *6 (W.D. Ark. Apr. 10, 2012); Tolliver v. Child.'s Home-Chambliss Shelter, 784 F. Supp. 2d 893, 903-904 (E.D. Tenn. 2011); Grudier v. Hendel's, Inc., No. 308CV369JBA, 2008 WL 1924971, at *1 (D. Conn. Apr. 30, 2008).

Like the district court, we find persuasive and instructive this uniformity of state and federal court interpretation of a vast array of state statutes -- many of which are as singular in their wording and structure as the MEPL. On the other hand, we have found only one state[16] that seemingly

---

[16] Louisiana has both an "Intentional Discrimination in Employment" statute -- prohibiting employers from "[i]ntentionally pay[ing] wages to an employee at a rate less than that of another employee of the opposite sex for equal work on jobs in which their performance requires equal skill, effort, and responsibility and which are performed under similar working conditions," La. Stat. Ann. § 23.332(A)(3) (emphasis added) -- as well as the state's Equal Pay for Women Act ("LEPWA"), a pay-equity statute that closely mirrors the FEPA and has no intent requirement. See id.

requires an employee to prove an employer acted with discriminatory intent to prevail on a state unequal wage claim: Oklahoma. In notable contrast to the MEPL, Oklahoma's equal pay statute compels such an interpretation with unambiguous statutory language to this effect -- i.e., it is illegal to "willfully pay" different wages to men and women. See Okla. Stat. Ann. tit. 40, § 198.1 (2023) ("It shall be unlawful for any employer within the State of Oklahoma to <u>willfully</u> pay wages to women employees at a rate less than the rate at which he pays any employee of the opposite sex for comparable work on jobs which have comparable requirements relating to skill, effort and responsibility") (emphasis added).[17]

Yet, in the face of all this evidence to the contrary, the dissent proclaims that our interpretation of the MEPL's plain language births "a far more sweeping prohibition" than "most pay-equity statutes in the country." To support this assertion, the dissent argues that our citation to states stretching from Massachusetts to California, and Arkansas to Minnesota, are inapt for a hodgepodge of unconvincing reasons, mostly nitpicking differences in wording in each state's statutory language as

---

§ 23:664. It does not appear that any courts have interpreted the LEPWA or otherwise reconciled the two statutes.

[17] There do not appear to be published court decisions outlining or otherwise analyzing the required elements of Oklahoma's pay-equity statute.

compared to the MEPL.

Citing to a table compiled by "The Pay Equity Project," for example, the dissent suggests that states not requiring proof of discriminatory intent to establish equal-pay-statute liability typically endeavor to offer balance through the concomitant provision of a "catch-all" affirmative defense like that found in the FEPA. But this sweeping observation by the dissent is not accurate. Nearly a dozen states do not provide for a "reasonable factor other than sex" affirmative defense in their respective pay-equity statutes.[18] Yet, to our knowledge, no court has read any one of these comparable state statutes to require the element of discriminatory intent to establish liability.

The dissent does concede that three states have equal-pay statutes containing language it deems similar enough to the MEPL's "discriminate . . . on the basis of sex" language and structure to be analogous to Maine's law: Idaho, South Dakota, and Kentucky. The dissent insists, however, that there is "literally" no way to discern how courts in Idaho, South Dakota, and Kentucky

---

[18] See Pay Equity Project, Fifty-State Pay Equity Law Summary (Nov. 10, 2021), https://www.law.uci.edu/centers/pay-equity-project/images/50-state-law-chart.pdf [https://perma.cc/D979-DG2C] (captured December 22, 2023) (describing each state statute and its employer defenses to pay-equity law violations, including the following states with no catch-all affirmative defense: Colorado, Idaho, Maine, Massachusetts, Montana, New Mexico, Oregon, South Dakota, Texas, Utah, and Wisconsin).

might interpret their own state's pay-equity statute. But, in fact, state and federal courts in Idaho have signaled that Idaho's statute also does not require a showing of discriminatory intent. See Perkins v. U.S. Transformer W., 974 P.2d 73, 75, 78 (Idaho 1999) (allowing jury verdict to stand finding employer liable under the state's pay-equity statute for paying different wages to male and female employees, but not finding the employer liable for "willful" discrimination under Idaho's analogue to Title VII), overruled on other grounds by Poole v. Davis, 288 P.3d 821, 825 n.1 (Idaho 2012); Johnson v. Canyon Cnty., No. 19-364, 2020 WL 5077731, at *2-3 (D. Idaho Aug. 27, 2020) (noting that the parties agreed that Idaho's pay-equity statute is to be construed in lockstep with the FEPA). Similarly, by "applying federal standards" to "wage discrimination claims arising under" Kentucky's pay-equity statute, federal courts in Kentucky have not required plaintiffs raising state law pay discrimination claims to show intent. Johnson v. Pennyrile Allied Cmty. Servs., No. 20-071, 2022 WL 1004873, at *15 (W.D. Ky. Apr. 4, 2022); accord Perry v. AutoZoners, LLC, 954 F. Supp. 2d 599, 607 (W.D. Ky. 2013) ("Kentucky courts analyze disparate wage claims under federal law standards."); Wiseman v. Whayne Supply Co., 359 F. Supp. 2d 579, 588 (W.D. Ky. 2004), aff'd, 123 F. App'x 699 (6th Cir. 2005) (citing elements of a FEPA claim as applicable to Kentucky's pay-equity statute).

The dissent goes on to insist, oddly, that Washington's pay-equity statute employs language that "invite[s] a requirement to prove such intent" to establish liability. See Wash. Rev. Code § 49.58.020 ("Any employer . . . who discriminates in any way in providing compensation based on gender between similarly employed employees . . . is guilty of a misdemeanor.").[19] In fact, Washington courts have recognized explicitly that the state's pay-equity statute is to be interpreted in lockstep with the FEPA -- strongly suggesting that Washington's statute does not require an employee to establish discriminatory intent.[20] See Adams, 722 P.2d

---

[19] As recognized by the dissent, despite a liability provision similar to that of the MEPL, the Washington statute also differs from the MEPL in various respects -- most notably, it contains, in addition to an enumerated list of exceptions to liability, an explicit catch-all affirmative defense.

[20] Indeed, in this regard, Washington hardly stands alone. As detailed above, a plethora of state pay-equity statutes have been interpreted by both state and federal courts just like the FEPA -- including, for example, both Connecticut, Conn. Gen. Stat. Ann. § 31-75(a), and New Jersey, N.J. Stat. Ann. § 34:11-56.2. See Fairchild v. Quinnipiac Univ., 16 F. Supp. 3d 89, 96 (D. Conn. 2014) ("Claims brought pursuant to the Connecticut Equal Pay Act [("CEPA")] are analyzed under the same standard as the [FEPA]." (quoting Morse v. Pratt & Whitney, No. 10-01126, 2013 WL 255788, at *11 (D. Conn. Jan. 23, 2013))); Paris-Purtle, 2015 WL 5622517, at *4 (summarizing that the Fairchild court "set forth the standard under which CEPA claims are viewed for legal sufficiency," including Fairchild's description that CEPA claims are analyzed identically to FEPA claims); Grigoletti v. Ortho Pharm. Corp., 570 A.2d 903, 911 (N.J. 1990) (describing that the New Jersey Equal Pay Act ("NJEPA") has "remained dormant," but "exemplifies an enduring legislative policy that is protective of the interest and status of women in the employment setting"); Spiewak, 2023 WL 869309, at *5 (recognizing that "courts considering NJEPA claims analyze such claims under the framework of the federal EPA," and

at 77 (noting that a prior version of Washington's equal pay act codified at Wash. Rev. Code § 49.12.175 was "virtually identical to the federal Equal Pay Act" and relying on FEPA cases to interpret the Washington statute as a matter of first impression); Hudon, 97 P.3d at 43 (summarizing that "Washington's equal pay act . . . is virtually identical to its federal counterpart," such that "[d]ecisions interpreting the federal act may then be helpful," and the court must "construe it to fulfill the underlying purpose of the legislature, which was to sweep away outmoded inequities and assure women equal pay for equal work" (citations omitted)); Gardner v. Wells Fargo Bank, NA, No. 19-0207, 2021 WL 2931341, at *6 (E.D. Wash. July 12, 2021) (explaining that under both the Washington equal pay statute and the FEPA, "[a] plaintiff must demonstrate a prima facie case by showing men and women received different pay for equal work," without any reference to an intent requirement).

Moreover, the dissent itself has not identified a single federal or state court decision construing any state pay-equity law to require intent to establish liability. Acadia likewise made no effort to do so -- despite the district court's direct invitation for supplemental authority to support Acadia's interpretation of the MEPL's statutory text. Given this remarkable

---

finding that the plaintiff stated a prima facie case under the NJEPA without showing intent).

consistency across state and federal court holdings, there seems little reason to suspect that state courts in South Dakota or Kentucky -- the other states with pay-equity statutes that the dissent considers similar enough to the MEPL -- would have any reason to reach a different conclusion.

In short, as far as we can tell, no pay-equity law, federal or state, has ever been construed by a court to require discriminatory intent to establish liability. Declining to read the MEPL to contain an unwritten intent element is hardly aggressive, somehow rendering Maine's statute "far more sweeping" than other pay-equity statutes in the country. It is, to the contrary, wholly congruent with overwhelming precedent. Indeed, to require intent would make Maine's equal pay statute the nation's distinct outlier.

### 3.  Legislative History

We recognize that, because we conclude that the MEPL's text is clear, Maine law advises against examining the statute's legislative history. See, e.g., Scamman, 157 A.3d at 229 (holding that courts should only "look beyond [a statute's text]" to examine "legislative history" "if the plain language . . . is ambiguous"). Nonetheless, given the parties' discussion of legislative history at oral argument, and the district court's discussion of that factor in its analysis, we address it briefly. That history, scant though it is, further accords with our reading of the MEPL's plain

text and undercuts Acadia's position.

As discussed by the district court, the original MEPL was passed by the Maine Legislature in 1949 without a purpose statement, a record of debate in the House or Senate, or committee commentary. See Mundell, 585 F. Supp. at 94-95; Wyman, supra, at 26. That law, as noted, included an equal work standard and several affirmative defenses, including a catch-all defense allowing a defendant to avoid liability upon a showing that the wage differentials were due to any "other reasonable differentiation except difference in sex." See Me. Pub. L. 1949, ch. 262, § 40-A.[21]

In 1963, Congress enacted the FEPA, which included an equal pay standard, just like the 1949 MEPL, and also included the catch-all affirmative defense that we have described: there would be no liability if the pay differential was "based on any other factor other than sex." Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56; 29 U.S.C. § 206(d). As noted above, two years after Congress adopted the FEPA, the Maine Legislature revised the MEPL and adopted the language at issue in this case.

The initial version of the revised MEPL introduced in the Maine Senate would have amended the first sentence of the 1949

---

[21] See also supra note 10, and accompanying text.

MEPL to read: "[n]o employer shall employ any female in any occupation within this State for salary or wage rates less than the salary or wage rates paid by that employer to male employees for equal or comparable work." L.D. 1189, 102d Leg. (Me. 1965). The bill then underwent revisions. There is no record explaining the reason for the revisions, and the bill was enacted again without a purpose statement, commentary, or debate. See Wyman, supra, at 28. However, the amendment's timing and the resemblance between the revised MEPL and the FEPA suggest that "the Legislature was reacting to passage of the federal Equal Pay Act two years earlier." Id. at 28-29.

The likely relationship between the adoption of the FEPA and the amended MEPL is reflected in both the statutes' similarities and their differences. As detailed above, see supra Section II.B.2.a, the final text of the 1965 MEPL closely mirrors the structure of the FEPA, suggesting that the Maine Legislature took cues from the federal provision. Those similarities, however, also suggest that the MEPL's departures from the FEPA are meaningful: (1) replacing the FEPA's "equal work" standard with a less stringent "comparable work" standard; (2) opting not to include FEPA's catch-all defense; and, (3) unlike the FEPA, qualifying its three defenses to ensure that they are not pretext for discriminatory animus.

In Scamman, 157 A.3d at 232, addressing another Maine

- 43 -

anti-discrimination statute, the Law Court determined that because the catch-all "reasonable-factor-other-than age" language "already existed in the ADEA when the" Maine Human Rights Act ("MHRA") "was enacted," the fact that such language was "absent from the MHRA sheds significant[] . . . light on the Legislature's intent." Hence, we are following Maine precedent by looking to the almost identical liability provision of the FEPA for guidance on how to read the MEPL's liability provision and giving effect to the differences between the two statutes' affirmative defenses provisions.[22]

It is also significant that, over the next several decades, the Maine Legislature neither revised the liability provision to clarify that intent is required nor reinstated the catch-all defense from the pre-1965 iterations of the MEPL -- even after the FEPA and similarly worded state pay-equity laws were interpreted by courts not to require a discriminatory motive. See, e.g., Corning Glass Works, 417 U.S. at 196; Jancey, 658 N.E.2d at

---

[22] To be sure, the Scamman court stressed that the affirmative defense provisions of the MHRA and the ADEA were not "substantively identical," because "[u]nlike the ADEA, the MHRA does not contain" a catch-all "reasonable factor other than age" affirmative defense. Scamman, 157 A.3d at 233.  The Scamman Court therefore reasonably observed, as the dissent highlights, that "neither the text of the [federal statute] nor the federal cases applying that text provide[d] helpful guidance for interpreting" the affirmative defense provision of the MHRA.  Id. But this aspect of the Scamman precedent hardly undermines our conclusion that the FEPA, and interpretative case law, are instructive in analyzing the substantively similar liability provision of the MEPL.

170; Vt. Hum. Rts. Comm'n, 136 A.3d at 196.  In the half-century since the 1972 Corning Glass Works decision -- when the FEPA's identical "discriminate . . . on the basis of sex" language was read to prohibit certain pay disparities even absent proven discriminatory intent by the employer, 417 U.S. at 196 -- the Maine Legislature has revised or supplemented the MEPL seven times, each time making it more effective at remedying gaps in pay between men and women.  These legislative acts did not revisit the liability or affirmative defense provisions of the 1965 text but rather altered a penalties provision,[23] added a new paragraph to the MEPL that established Equal Pay Day as a holiday,[24] required the Department of Labor to annually report on progress made within the state to comply with the MEPL,[25] directed the Department of Labor to adopt rules in consultation with the Maine Human Rights Commission to improve compliance with the MEPL,[26] mandated that

---

[23] Me. Pub. L. 1983, ch. 652, § 4.  The last sentence of the MEPL had at one point imposed a $200 fine on employers who violated the equal pay law.  This was deleted in 1983.  At the same time, the Maine Legislature amended § 626-A, governing "Penalties," to provide that violation of certain enumerated labor laws, including the MEPL, would result in a fine of "not less than $100 or more than $500 for each violation."  Id. § 2.  The current version of the Penalties section provides that an employer who violates the MEPL "is subject to a forfeiture of not less than $100 nor more than $500 for each violation."  Me. Stat. tit. 26, § 626-A.

[24] Me. Stat. tit. 1, § 145 (Supp. 2001).

[25] Me. Pub. L. 2001, ch. 304, § 2.

[26] L.D. 329, 18th Leg., 1st Reg. Sess. (Me. 1997).

employers allow employees to disclose their own wages or inquire about the wages of others in order to enforce the MEPL,[27] and passed § 628-A to prohibit employers from inquiring about compensation history when hiring a prospective employee.[28]  Indeed, each time the Maine Legislature has opted to revisit the wording of the MEPL over the years, it has consistently made legislative choices to ensure that the state law would be more protective of the rights of employees than its federal counterpart.

In fact, in 2023 the Maine Legislature again revisited the language of the MEPL, revising it significantly, this time to add race as an additional covered group under the MEPL.  See Me. Pub. L. 2023, ch. 266.  Importantly, this legislative decision occurred well after the district court issued its 2022 decision holding that liability under the MEPL does not depend on a showing of intent.  We, along with the Law Court, presume that the Legislature enacted that revision to the MEPL with knowledge of

---

[27] Me. Pub. L. 2009, ch. 29, § 1.

[28] Me. Rev. Stat. tit. 26, § 628-A.  Of particular relevance, the Maine Legislature's 2019 statutory provision included the following language: "The Legislature finds that despite requirements regarding equal pay having been a part of the laws of Maine since 1965, wage inequality is an ongoing issue in the State. Wage inequality causes substantial harm to the citizens and to the economy of the State."  The new statutory language then makes clear that the Legislature was banning employers from inquiring about past compensation because such a practice "directly perpetuates [] wage inequality."

the district court's decision.  See, e.g., Blier v. Inhabitants of Town of Fort Kent, 273 A.2d 732, 734 (Me. 1971) (recognizing that the Maine Legislature is presumed to enact laws "in view of, and with reference to, existing laws and judicial decisions" (cleaned up)).  Hence, we read significance into the Maine Legislature's apparent acceptance of the district court's reading of the plain language of the MEPL.

Against all this evidence of a legislative determination to advance the "equal pay for comparable work" objectives of the MEPL, Acadia puts forward only one legislative history argument. It asserts that the Legislature appears to have made a tradeoff in 1965 in which it eliminated the catch-all defense from the affirmative defenses provision and replaced it with an intent requirement in the liability provision by using the phrase "discriminate . . . on the basis of sex."

Notably, Acadia presented this argument for the first time at oral argument, and we therefore are entitled to ignore it as waived.[29]  See United States v. Leoner-Aguirre, 939 F.3d 310,

---

[29] Even though Acadia only raised this point briefly at oral argument, the dissent eagerly embraces this tradeoff argument and elaborates upon it.  In doing so, the dissent, without citation to any authority, and without any attempt to offer a rationale, contends that the ordinary principles of appellate waiver should not bear their usual weight in this case because we are predicting how the Law Court would construe the MEPL.  Why does that context matter?  The dissent never tells us.  We are given no coherent reason to diverge from the ordinary application of our waiver jurisprudence.  See United States v. Zannino, 895 F.2d 1, 17 (1st

319 (1st Cir. 2019). Nevertheless, for the sake of completeness, we will address it. Acadia's theory regarding the Maine Legislature's motive is pure speculation. Acadia identifies not a scintilla of legislative history or commentary to support its argument that the Legislature in 1965, concerned about language changes to the MEPL that strengthened its equal pay objectives, decided to compensate for that strengthening by introducing an intentional discrimination requirement that would simultaneously circumscribe the law's protective purpose. Acadia cannot use such speculation to create a statutory ambiguity that is simply not there. As the Supreme Court has said, "[l]egislative history . . . is meant to clear up ambiguity, not create it." Milner v. Dep't of Navy, 562 U.S. 562, 574 (2011).

In sum, all reliable indicia of legislative history show that the Maine Legislature, by means of the MEPL, sought to afford protections greater than those offered by the FEPA.

---

Cir. 1990) (making clear that waiver exists to stop attorneys from "leaving the court to do counsel's work, create the ossature for the argument," or "put flesh on [the] bones" of weakly made points). Furthermore, it is manifestly unfair that Mundell has not had an opportunity to respond to the dissent's hypothesized arguments largely benefitting Acadia. See Day v. McDonough, 547 U.S. 198, 210, (2006) ("Of course, before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions."); Tandon v. Newsom, 992 F.3d 916, 928 (9th Cir.), disapproved on other grounds, 141 S. Ct. 1294 (2021) (noting that because "plaintiffs have not made [the dissent's] argument, and the State has had no reason or opportunity to respond to them, we decline to express an opinion on them now, let alone rely on them to grant [the requested relief]").

### 4. Policy Implications

Finally, Acadia emphasizes two policy concerns that it contends arise from the district court's plain text reading of the MEPL. Acadia claims the provision would (1) diminish Maine's ability to attract and retain a skilled and diverse workforce and (2) impose a significant burden on employers by requiring them to track compensation differentials among their employees.

Acadia's policy arguments are beside the point. The Supreme Court has stated that "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1737 (2020); see also Whitney v. Wal-Mart Stores, Inc., 895 A.2d 309, 315 (Me. 2006) (reasoning that policy arguments cannot override the law as written because "legislative policy arguments are more appropriately left to the executive and the Legislature to resolve").

In any event, we agree with the district court that reading the MEPL to lack an intent requirement does not lead to absurd policy results. As to flexibility in hiring, the MEPL does not close the door for an employer to establish legitimate pay disparities between men and women. There are preliminary showings that must be made before a claimant can invoke the protective purpose of the MEPL. The MEPL only applies where employees perform "comparable work on jobs that have comparable requirements

relating to skill, effort[,] and responsibility." <u>See</u> Me. Stat. tit. 26, § 628.    And even then, the statute creates three affirmative defenses for pay differentials.    <u>See id.</u>

As for asking employers to track pay differentials, we acknowledge that the plain reading of the MEPL may require employers to monitor how employees of different sexes are paid for comparable work and to articulate one of the authorized reasons provided by the statute for any disparity.    These are hardly absurd requirements.    Employers typically are in a better position than employees to monitor how employees doing comparable work are being paid.    This case illustrates that very point.    Mundell worked for Acadia for more than two years before she learned that she was being paid less than her male colleagues.

## C.    The MEPL & Treble Damages

The parties also dispute whether Mundell is entitled to treble damages for the unpaid wages that accrued while she was paid less than her male colleagues in violation of the MEPL. Section 626-A of title 26 sets out the penalties for violations of the MEPL and certain other enumerated provisions of Maine's wage laws.    Although the provision applies by its terms to MEPL claims, Acadia argues that it does not provide for treble damages for such claims.[30]    The disputed statutory language reads in full:

---

[30] Notably, the MEPL does not have its own penalty provision, precluding any argument that the MEPL might displace section 626-

> Whoever violates any of the provisions of section 600-A, sections 621-A to 623 or section 626, 628, 628-A, 629 or 629-B is subject to a forfeiture of not less than $100 nor more than $500 for each violation.
>
> Any employer is liable to the employee or employees for the amount of unpaid wages and health benefits. Upon a judgment being rendered in favor of any employee or employees, in any action brought to recover unpaid wages or health benefits under this subchapter, such judgment includes, in addition to the unpaid wages or health benefits adjudged to be due, a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages.

Me. Stat. tit. 26, § 626-A (emphases added).  This text authorizes two possible penalties: "forfeiture of not less than $100 nor more than $500 for each violation" and treble damages for any "unpaid wages or health benefits adjudged to be due."

The treble damages penalty is outlined in the second paragraph of section 626-A.  The Law Court has made clear that the treble damages paragraph applies to violations of any law listed in section 626-A to the extent that the employer is liable for "unpaid wages," because removing the possibility of treble damages

---

A's statutory penalties provision.  See Me. Stat. tit. 26, § 628; see also Beckwith v. United Parcel Serv., Inc., 889 F.2d 344, 350-51 (1st Cir. 1989) (considering, but ultimately rejecting, the argument that section 626-A penalties are displaced by more specific remedies listed under Me. Stat. tit. 26, § 629); Noll v. Flowers Foods, Inc., No. 1:15-cv-00493-LEW, 2021 WL 904859, at *5 (D. Me. Mar. 9, 2021) (same).

"would strip" Maine's wage laws "of [their] effectiveness." Cooper v. Springfield Terminal Ry. Co., 635 A.2d 952, 955 (Me. 1993). The Law Court has further clarified that the term "unpaid wages" includes instances in which an employee has not been "paid in full" -- as well as instances in which an employee has been denied pay entirely. In re Wage Payment Litig., 759 A.2d 217, 223-24 (Me. 2000).

Therefore, if a law is listed in section 626-A -- as is the MEPL -- and a violation of that law results in unpaid wages, the treble damages remedy is available. The MEPL targets a particular type of wage violation, and the damages from a violation necessarily include compensation for unpaid wages. We thus think it obvious that litigants who prove a violation of the MEPL are entitled to the remedies provided in the second paragraph of section 626-A. See Beckwith v. United Parcel Serv., 889 F.2d 344, 350-51 (1st Cir. 1989) (suggesting that "an employer who violates the equal pay requirements in [the MEPL] could be required to pay the affected employees liquidated damages and attorney's fees as provided by § 626-A").

Acadia raises several unpersuasive counterarguments to this construction of section 626-A. First, Acadia maintains that a MEPL violation results in damages, not unpaid wages, because it is a statute focused on intentional discrimination rather than on wage disparity. But we have already explained that the MEPL is

not focused on intentional discrimination; rather, it seeks to remedy pay disparities between men and women for comparable work.

Second, Acadia argues that an employee cannot pursue a claim for failure to pay wages in lieu of or in addition to pursuing a claim for discrimination. But courts have long established that a party can suffer employment discrimination because of a wage disparity and bring two claims: one for damages under a discrimination statute and another to recover unlawfully withheld wages under a wage statute. See, e.g., Rodriguez v. Smithkline Beecham, 224 F.3d 1, 5-9 (1st Cir. 2000) (considering both a Title VII wage discrimination claim for damages and a FEPA claim for unpaid wages brought by the same employee).

Third, Acadia argues that Mundell does not have a claim for unpaid wages because Acadia paid Mundell "what it had agreed to pay her throughout her tenure." This argument fails because it is inconceivable that an agreement by an employer to pay a wage that is contrary to Maine law could override the requirements of that law.

Fourth, Acadia asserts that the MEPL is primarily about voluntary compliance because the Maine Department of Labor, at the instruction of the Legislature, crafted regulations to bring about greater voluntary compliance with the MEPL. But that legislative act did not purport to replace the option of enforcing the MEPL through a civil action; rather, as we noted in our review of the

legislative history, the Legislature simply sought to improve compliance with the MEPL.

Finally, Acadia contends that it would be "absurd" to allow an employee to recover treble damages because such a large award "would be financially devasting for the employer and provide a windfall to the employee." But courts have repeatedly emphasized that Maine wage laws are "remedial" and have a "broadly protective purpose," and thus have rejected claims that treble damages for violations of them are punitive. Giguere v. Port Res. Inc., 927 F.3d 43, 51 (1st Cir. 2019) (quoting Bisbing v. Me. Med. Ctr., 820 A.2d 582, 584-85 (Me. 2003)). If treble damages for violations of Maine's wage laws serve the law's "broadly protective purpose," it is difficult to understand why treble damages for violations of Maine's equal pay provision would be absurd.

Thus, we, like the district court, conclude that section 626-A entitles Mundell to "unpaid wages" for the time that she was unlawfully underpaid by Acadia, plus "a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages." Me. Stat. tit. 26, § 626-A.

### III.

For the foregoing reasons, we affirm the district court's grant of Mundell's partial motion for summary judgment against Acadia under the liability provision of the MEPL, affirm

the damages award in the amount of $180,955.90, and deny Acadia's motion to certify questions about the MEPL and title 26, § 626-A to the Law Court.

So ordered.

**- Dissenting Opinion Follows -**

BARRON, **Chief Judge, dissenting**. Maine's courts presume
that the state's statutes use the same words to mean the same
thing. The majority nonetheless holds that the Maine Equal Pay
Law ("MEPL"), Me. Stat. tit. 26, § 628, is the unusual Maine
statute that uses the same words to mean different things -- and
in successive sentences, no less.[31]  As a result, the majority
decides for itself that the MEPL -- which no Maine court has yet
construed -- establishes a far more sweeping prohibition than
either its federal counterpart, the Federal Equal Pay Act ("FEPA"),
29 U.S.C. § 206(d), or most pay-equity statutes in the country.
See Pay Equity Project, Fifty-State Pay Equity Law Summary (Nov.
10, 2021), https://perma.cc/D979-DG2C.

Maine is, of course, free to enact a pay-equity measure
as sweeping as the majority holds that Maine has. Maine is even
free to do so by using the same words to mean irreconcilable
things. But before we may decide that the state has done so, we
must be confident that its highest court would agree with that
decision. And, in my view, neither the text of the MEPL nor any
other interpretive sources can give us that confidence. I thus
would certify to the Maine Law Court the question about how to

---

[31] After argument in this case, the Maine legislature amended the
MEPL to add "race" as a protected category alongside "sex."
Because that version of the statute was not in force at the time
of the conduct at issue in this case, we construe here the text of
the prior version of the statute.

construe the MEPL that is before us in this appeal, as that court, unlike ours, need not guess about the construction of the MEPL that it would adopt.[32]

## I.

### A.

The interpretive question at issue here concerns whether the MEPL makes an employer liable merely for paying differential wages to employees of different sexes for comparable work or only for paying such differential wages when the employer is also shown in doing so to have engaged in intentional discrimination on the basis of sex.  The difficulty in answering that question arises because, in successive sentences, the MEPL repeats in nearly identical fashion words that refer to an employer's decision to discriminate on the basis of sex.  Specifically, the MEPL's first sentence provides that an employer may not "discriminate . . . on the basis of sex by paying wages to any employee . . . at a rate less than the rate at which the employer pays any employee of the opposite sex for comparable work," Me. Stat. tit. 26, § 628 (emphasis added), while the MEPL's second sentence provides that

---

[32] Because I would certify this question to the Maine Law Court, I would not reach the second interpretive question at issue in this appeal, which concerns the availability of treble damages. If the Law Court were to disagree with the reading of the MEPL that the majority adopts, I see no reason why we would not simply remand the case to the District Court without reaching the damages question.

such differential wages paid "pursuant to established seniority systems or merit increase systems or difference in the shift or time of the day worked that do not <u>discriminate on the basis of sex</u> are not within the prohibitions in this section."  <u>Id.</u> (emphasis added).

As the majority sees things, it is perfectly clear that the MEPL does not require an employer to have engaged in intentional sex-based discrimination to be liable under the MEPL. According to the majority, the measure clearly makes an employer liable -- barring any exception that the MEPL's second sentence sets forth -- merely for having paid employees of different sexes differential wages for comparable work.

The majority comes to this conclusion based solely on the MEPL's text, because the majority concludes that the MEPL's first sentence clearly defines an employer's decision to pay differential wages to employees of different sexes for comparable work as a decision to "discriminate . . . on the basis of sex." The majority recognizes that this construction works, however, only if the phrase "discriminate on the basis of sex" in the MEPL's second sentence does not mean what "discriminate . . . on the basis of sex" in that statute's first sentence does.  The majority knows that the MEPL's second sentence would not parse if the words "discriminate on the basis of sex" were construed to mean only "paying wages to any employee . . . at a rate less than the rate

at which the employer pays any employee of the opposite sex for comparable work."  That sentence parses only if those words are read to be referring to the employer's intentional discrimination based on sex, as the sentence then provides, quite coherently, that an employer may make certain kinds of differential payments to employees of different sexes only when the differential is not the result of the employer's intentional sex-based discrimination.

The majority necessarily is concluding, therefore, that it is clear from the MEPL's text alone that the MEPL is using all-but-identical phrases to mean contradictory things across its two sentences.  So, the majority must explain how we can be confident that the Maine Law Court would agree when Maine courts ordinarily read Maine statutes to use the same words to mean the same things. See, e.g., Att'y Gen. v. Sanford, 225 A.3d 1026, 1030 (Me. 2020) (reasoning that "[t]he [Maine] Legislature's use of nearly identical language" in two related statutes "demonstrate[d] [the Legislature's] intent" to establish "equal" standards (emphasis in original) (citing Great. N. Nekoosa Corp. v. State Tax Assessor, 675 A.2d 963, 967-68 (Me. 1996) (Clifford, J., dissenting) ("Identical words in different parts of the same statute are presumed to have the same meaning" (emphasis in original))).

The majority's explanation relies in part on the fact that the MEPL's first sentence uses the word "by" to link the phrase "discriminate . . . on the basis of sex" to the phrase

"paying of . . . ." As a matter of ordinary speech, the majority reasons, that formulation plainly defines "discriminat[ion] . . . on the basis of sex" to be the mere paying of the differential wages.

The District Court offered an analogy to support the same conclusion. It asserted that a referee's rule that "players may not engage in unsportsmanlike conduct by celebrating a touchdown" plainly makes it "beside the point to argue about whether a particular celebration was unsportsmanlike" because "the referee removed all ambiguity by defining the conduct that is deemed unsportsmanlike." The District Court then explained that the first sentence of the MEPL is no different, as the word "by" there similarly makes clear that it is "beside the point" whether the employer intended to "discriminate . . . on the basis of sex" in paying differential wages.

It is not necessarily the case, however, that when the word "by" follows words that describe a certain type of conduct, the word "by" signals that the next set of words defines that conduct. A law that bans the "theft of electronic funds by unauthorized computer access," for example, plainly does not define the "unauthorized computer access" itself to be prohibited "theft," as no one could doubt that the "access" still must result in "theft" to be barred. Indeed, it is not even clear to me that the District Court's posited ban on "unsportsmanlike conduct by

celebrating after a touchdown" must be read to forbid literally all touchdown celebrations.  I do not think it self-evident that it would be "unsportsmanlike" for players on one high school football team to celebrate an opposing player's touchdown if they knew that the player who scored it had overcome great adversity.

Simply put, when a statute uses the word "by" as the MEPL's first sentence does, that word may signal no more than that the words that follow it set forth a specific means of carrying out the conduct that is barred, so that those trailing words limit rather than define the kind of conduct that is barred.  And, when that is so, the statutory text alone will not suffice to make clear the nature of the prohibited conduct -- whether "theft," "unsportsmanlike conduct," or an employer's decision to "discriminate . . . on the basis of sex" -- unless the words that name that conduct in and of themselves make the nature of that conduct clear.

As a result, it seems to me that the text of the MEPL's first sentence would clearly compel the majority's reading only if the word "by" were clearly signaling that a decision to pay differential wages to employees of different sexes for comparable work is in and of itself a decision to "discriminate . . . on the basis of sex" rather than merely a specific means of carrying out the only kind of conduct that the MEPL prohibits: a decision by an employer to intentionally discriminate on that basis.  After all,

the majority appears to agree that the words "discriminate . . . on the basis of sex" do not themselves make clear that the MEPL's prohibition encompasses decisions by employers that do not intentionally discriminate on the basis of sex, as the majority does not suggest that those words may never be read to be referring only to decisions by employers to engage in such discrimination intentionally. In fact, the majority reads those very same words in the MEPL's second sentence to be referring solely to discriminatory conduct based on sex that is of that intentional kind.

The majority does attempt to shore up its reading of the MEPL by pointing out -- rightly -- both that we must construe the statute's first sentence in the context of the statute as a whole and that the Maine Law Court is not in the habit of construing the state's statutes to render portions of them superfluous. The majority then asserts that, as a result, the MEPL's first sentence must be read to be defining an employer's decision to pay the differential wages as itself a decision to "discriminate . . . on the basis of sex," because otherwise the statute's second sentence, in exempting an employer's decision to pay the differential wages in certain circumstances, would be rendered superfluous.

The majority's own construction of the MEPL, however, appears to be in some tension with the anti-superfluity canon that the majority invokes. If the majority were right that the MEPL's

first sentence prohibits an employer's decision to pay the differential wages and defines that decision as "discriminat[ion] . . . on the basis of sex," then the first sentence could have cut right to the chase and simply read, "An employer may not pay wages to any employee . . . at a rate less than the rate at which the employer pays an employee of the opposite sex for comparable work[.]" In fact, though, the first sentence includes -- seemingly unnecessarily, under the majority's reading -- the words "discriminate . . . on the basis of sex."

The majority does assert that, under its construction of the MEPL, the phrase "discriminate . . . on the basis of sex" is not, in fact, superfluous. On the majority's view, that phrase still serves the useful function of clarifying that the conduct that follows the word "by" is itself a type of "discriminat[ion] . . . on the basis of sex."

But if the anti-superfluity canon tolerates words that are not strictly necessary so long as they are clarifying, then I do not see why we must conclude that that canon plainly rules out the reading of the MEPL that the majority rejects. It would not be unprecedented for a pay-equity statute to clarify its scope by setting forth a few safe harbors for employers that were not strictly necessary to announce. Indeed, the federal counterpart to the MEPL, the FEPA, lists specific examples of non-sex-based pay differentials that are allowed even though that statute also

contains a catch-all exemption for all pay differentials that are based on a factor other than sex. See 29 U.S.C. § 206(d) (prohibiting the payment of differential wages "on the basis of sex . . . except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex" (emphasis added)).

Here, the MEPL's two-sentence structure and use of the passive construction "are not within this prohibition," Me. Stat. tit. 26, § 628, plausibly invite one to read the MEPL's second sentence to be doing something similar. On this understanding, the MEPL's second sentence expressly names certain common types of conduct that are exempt from the first sentence's ban on discrimination on the basis of sex when those types of conduct do not result from intentional discrimination on that basis, even though the first sentence already establishes that the ban does not cover any conduct that is not the result of such intentional discrimination.

For all these reasons, then, I conclude that the MEPL's text at most reveals that we have a classic contest between linguistic canons. In one corner is the same words-same meaning canon, which suggests that the MEPL requires proof of the employer's intentional discrimination on the basis of sex. In the

other corner is the anti-superfluity canon, which suggests that no
such proof is required.

The majority concludes, based on the MEPL's text alone,
that the Maine Law Court would decide that the anti-superfluity
canon prevails here.  But I cannot see how we can be so sure, if
the text is our only guide, when the Maine Law Court is sensibly
sensitive to context in applying that canon, see Cent. Me. Power
Co. v. Devereux Marine, Inc., 68 A.3d 1262, 1266 (Me. 2013) ("'All
words in a statute are to be given meaning,' and no words are to
be treated as surplusage 'if they can be reasonably construed.'"
(citation omitted and emphasis added)), and that court has recently
relied on the same words-same-meaning canon to interpret a Maine
law, see Sanford, 225 A.3d at 1030 (reasoning that "[t]he [Maine]
Legislature's use of nearly identical language" in two related
statutes "demonstrate[d] [the Legislature's] intent" to establish
"equal" standards (emphasis in original) (citing Great. N. Nekoosa
Corp., 675 A.2d at 967-68 (Clifford, J., dissenting) ("Identical
words in different parts of the same statute are presumed to have
the same meaning" (emphasis in original))).  In my view, therefore,
the statutory text alone fails to show that the interpretive answer
to the question at hand is as clear as the majority contends.

**B.**

The majority does suggest that even if the MEPL's text
is not, in and of itself, decisive, an interpretive tiebreaker on

which Maine courts generally rely is.  See O'Connor v. Oakhurst Dairy, 851 F.3d 69, 79-81 (1st Cir. 2017) (not certifying question to Maine Law Court despite ambiguous text because Law Court precedent supplied "default rule of construction" that resolved ambiguity).  The interpretive tie-breaker that the majority has in mind is set forth in Gordon v. Maine Central Railroad, 657 A.2d 785, 786 (Me. 1995), in which the Maine Law Court explained that "[w]hen . . . a term is not defined in either the relevant statutory provisions or in prior decisions of [the Maine Law Court], Maine Courts may look to analogous federal statutes, regulations, and case law for guidance."  This extra-textual look, however, only adds to my reasons for thinking that it would be useful to ask the Maine Law Court for its view.

The majority notes that the MEPL's federal counterpart, the FEPA, begins much like the MEPL, as the FEPA states: "No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work," 29 U.S.C. § 206(d)(1).  The majority then points out that the Supreme Court of the United States has construed that language in the FEPA not to require proof of intentional discrimination on the basis of sex.  See Corning Glass Works v. Brennan, 417 U.S. 188, 195-96 (1974).  Thus, the majority reasons, we can be confident that, to ensure that parallel state

and federal measures are construed in parallel fashion, the Maine Law would construe the MEPL's first sentence the same way that the similar language in the FEPA has been construed.

The problem with this reasoning is that the Maine Law Court looks to federal law to interpret its own statutes only "when the federal and state laws are <u>substantially identical</u>." <u>Scamman v. Shaw's Supermarkets, Inc.</u>, 157 A.3d 223, 233 (Me. 2017) (emphasis added) (quoting <u>Percy</u> v. <u>Allen</u>, 449 A.2d 337, 342 (Me. 1982)).  I cannot see, however, the basis for our being confident that the Maine Law Court would conclude that the MEPL and the FEPA are substantially identical.

The FEPA, like the MEPL, does expressly identify practices that the FEPA's prohibition does not cover.  But the FEPA identifies those practices in the same sentence that sets forth the prohibition itself, and the FEPA then sets off the exempt practices through the word "except."  29 U.S.C. § 206(d)(1).  By contrast, the MEPL identifies the practices that its prohibition expressly exempts in a separate sentence from the one that establishes the prohibition itself, and the MEPL does so by using the phrase "discriminate on the basis of sex" in the second sentence after using the phrase "discriminate . . . on the basis of sex" in the first sentence.

As a result, the text of the FEPA simply does not present the interpretive conundrum that the MEPL does about how the phrase

"discriminate on the basis of sex" in the second sentence stands in relation to the all-but-identical phrase "discriminate . . . on the basis of sex" in the first sentence.  For that reason, I do not see how we can be sure that the Maine Law Court would look to Corning Glass Works to make sense of that conundrum.

The majority does interpret Scamman to mean that Maine courts "otherwise construe[] Maine discrimination laws to give effect to any [textual] differences" between those laws and their federal counterparts.  And, on that basis, the majority contends that the limited list of exempt practices in the MEPL in and of itself shows that statute is meant to prohibit more conduct than the FEPA, given that the FEPA has a catch-all (and thus much broader) exemption.

But in Scamman itself the Maine Law Court determined that the Maine Human Rights Act ("MHRA"), 4 Me. Stat. § 57, and its counterpart federal statute, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, were "not substantially identical" -- and therefore that "neither the text of the [federal statute] nor the federal cases applying that text provide[d] helpful guidance for interpreting [the MHRA]." Scamman, 157 A.3d at 233.  And the Scamman court did so precisely because, "[u]nlike the ADEA, the MHRA does not contain" a catch-all "reasonable factor other than age" affirmative defense.  Id. at 233, 230 (emphasis added).

Here, precisely the same "substantive difference" is present, id., and, moreover, the relevant federal statute does not repeat the critical "discriminate" phrase that the MEPL does.  The majority thus needs to explain, insofar as it is relying on Scamman, why we should not "give effect" to these plain textual differences between the MEPL and the FEPA, as they are differences that would appear to establish that, like the measures at issue in Scamman, the FEPA and the MEPL are not "'substantially identical'" and so should not be construed as if they were.  Scamman, 157 A.3d at 233 (quoting Percy, 449 A.2d at 342).

There is also a very practical reason for us to be wary of predicting that the Maine Law Court would construe the MEPL's first sentence as the FEPA's similar language has been construed. As it turns out, the scope of the MEPL and the FEPA would in practical effect be quite similar if the intent-based reading of the MEPL were embraced.

If the MEPL were so construed, then there would be good reason to construe that statute to incorporate the burden-shifting framework for proving intentional discrimination that is common to civil rights measures.  Cf. Scamman, 157 A.3d at 233, 228 (holding that "the business necessity" "burden-shifting scheme" that federal courts apply to Title VII disparate impact claims "applies to disparate impact age discrimination claims brought pursuant to the [Maine Human Rights Act ("MHRA")].").  And, in that event, an

- 69 -

employer could be liable under the MEPL for the mere conduct of paying differential wages to employees of different sexes for comparable work absent the employer showing that the differential was based on "some legitimate, nondiscriminatory reason" that was not a pretext for discrimination based on sex, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."), much as an employer is liable under the FEPA merely for paying such differential wages absent the employer showing that the differential was based on "any other factor other than sex," 29 U.S.C. § 206(d)(1).

If the MEPL were construed not to require proof of the employer's intentional discrimination, however, then, paradoxically, the daylight between the MEPL and the FEPA would be quite substantial.  So read, the MEPL would bar an employer from basing a pay differential between employees of different sexes on, say, the greater educational attainment or experience of the higher-paid employee, see Merillat v. Metal Spinners, Inc., 470 F.3d 685, 697-98 (7th Cir. 2006), the competitive nature of the job market at the time of the higher-paid employee's recruitment, see Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 684 (8th Cir.

2001), or the need to match the higher-paid employee's previous salary, see Engelmann v. Nat'l Broad. Co., No. 94-CIV-5616, 1996 WL 76107, at *10 (S.D.N.Y. Feb. 22, 1996). Yet, the FEPA has been construed to permit each of those common compensation practices.

As a result, I am not at all sure that the Maine Law Court would conclude that the interpretive tie-breaker that the majority invokes favors the majority's reading of the MEPL. By interpreting the MEPL's language to parallel the FEPA's, the Maine Law Court would not be aligning the two measures, in practical effect. Rather, it would be driving them farther apart than they otherwise would be.

The majority does point out that the MEPL refers to "comparable" work while the FEPA refers only to "equal work," and the majority suggests that this textual difference clearly shows that the MEPL is intended to be stricter than the FEPA in barring differential pay. The fact that the MEPL is stricter than the FEPA in that one respect, however, does not necessarily show to me that the MEPL is intended to be stricter along the dimension that matters for present purposes. Thus, I cannot see how we can glean from this textual difference any confidence that the Maine Law Court would apply the interpretive tie-breaker on which the majority relies, especially when the tie-breaker's application here would make the scope of the two measures more rather than less divergent.

**c.**

The majority also suggests that there is good reason to have confidence that the Maine Law Court would construe the MEPL not to require proof of an employer's intentional discrimination based on sex because of the way that other states have chosen to ensure pay equity. But here, too, I cannot agree.

The majority rightly identifies a minority of eleven state equal-pay laws that both have no catch-all affirmative defense to liability and have not been authoritatively construed to require the plaintiff to make a showing of intentional discrimination on the basis of sex. But as the majority must acknowledge, ten of those statutes are worded very differently from the MEPL, including by virtue of the fact that they do not repeat the critical "discriminate" phrase in successive sentences as the MEPL does.[33]

True, three state equal-pay statutes -- Idaho's, South Dakota's, and Kentucky's -- share the textual features that combine to create the ambiguity in the MEPL that concerns me: the use of the words "discriminate . . . on the basis of sex by paying [unequal] wages" in the first sentence; the use of "discriminate on the basis of sex" in the second sentence; and the lack of an

---

[33] See Colo. Rev. Stat. § 8-5-102; Mass. Gen. Laws ch. 149, § 105A; Mont. Code Ann. § 39-3-104; N.M. Stat. Ann. § 28-23-3; Or. Rev. Stat. § 652.220; Tex. Labor Code Ann. § 21.102; Utah Code Ann. § 34A-5-106; Wis. Stat. § 111.36.

expansive catch-all exemption akin to the FEPA's. See Idaho Code § 44-1702; S.D. Codified Laws §§ 60-12-15 to -16; Ky. Rev. Stat. Ann. § 337.423. But, as best I can tell, only these three states have pay-equity measures so worded, and there is no precedent that construes any of them that is both from the highest court in the relevant state and resolves the textual conundrum that each, like the MEPL, presents in the way that the majority resolves it.[34] So, we literally have no indication that the highest court of any state would construe a measure that is worded like the MEPL in the way that the majority contends that it is clear that the Maine Law Court would.

In addition, as the majority acknowledges, it would not be unheard-of for a state to enact an equal pay statute that requires a showing of intentional discrimination on the basis of sex. See Okla. Stat. tit. 40, § 198.1 ("It shall be unlawful for any employer within the State of Oklahoma to willfully pay wages to women employees at a rate less than the rate at which he pays

---

[34] True, in Perkins v. U.S. Transformer W., 974 P.2d 73 (Idaho 1999), overruled on other grounds by Poole v. Davis, 288 P.3d 821, 825 n.1 (Idaho 2012), the Idaho Supreme Court noted that a jury found an employer liable under Idaho's equal-pay statute for paying a female employee less than her male counterparts but did not find the employer liable for willful discrimination under Idaho's analogue to Title VII. Id. at 75. The legal issue before the court, however, concerned only attorney's fees. We therefore lack any insight into the basis for the divergent jury verdicts or whether the employer made any argument akin to the one that the employer in this case now makes.

any employee of the opposite sex for comparable work on jobs which have comparable requirements relating to skill, effort and responsibility[.]").  Indeed, there is at least one other state equal-pay measure that uses words that invite a requirement to prove such intent that has not yet been authoritatively construed to dispense with that requirement.  See Wash. Rev. Code § 49.58.020 ("Any employer . . . who discriminates in any way in providing compensation based on gender between similarly employed employees . . . is guilty of a misdemeanor.").[35]

The majority also points out that state and federal courts in Vermont, California, Minnesota, Connecticut, Washington, New Jersey, Arkansas, and Tennessee have interpreted state equal-pay laws "to not require proof of an employer's discriminatory intent to establish liability."  But each of those laws is also worded very differently from the MEPL.  In fact, like the FEPA, none repeats the critical "discriminate" phrase in successive sentences, and each (like the FEPA) contains a catch-all provision that exempts pay differentials that did not result from intentional discrimination on the basis of sex.  See Vt. Stat. Ann. tit. 21, § 495; Cal. Lab. Code § 1197.5; Minn. Stat. § 181.67; Conn. Gen.

---

[35] Although the Supreme Court of Washington applied cases interpreting the FEPA in interpreting that state's equal pay statute in Adams v. University of Washington, 722 P.2d 74, 77 (Wash. 1986), that court did so only because both parties urged the court to do so, id.

Stat. § 31-75; Wash. Rev. Code § 49.58.020; N.J. Stat. Ann. § 34:11-56.2; Ark. Code Ann. § 11-4-610; Tenn. Code Ann. § 50-2-202.

For similar reasons, I do not find much insight into how the Maine Law Court would construe the MEPL in the Massachusetts Supreme Judicial Court's ("SJC") construction of that state's equal-pay measure in Jancey v. School Committee of Everett, 658 N.E.2d 162 (Mass. 1995). For, while the majority contends the SJC's decision there supports the conclusion that the Maine Law Court would read the MEPL not to require proof of an employer's intentional discrimination on the basis of sex, the Massachusetts measure reads: "No employer shall discriminate in any way on the basis of gender in the payment of wages, or pay any person in its employ a salary or wage rate less than the rates paid to its employees of a different gender for comparable work." Mass. Gen. Laws ch. 149, § 105A (emphasis added). Thus, through the word "or", that measure, unlike the MEPL, plainly announces two distinct prohibitions, one on "discriminat[ing] . . . on the basis of gender in the payment of wages" and another on the mere conduct of paying unequal wages.[36]

---

[36] Several other states also have -- or had -- equal-pay measures that establish two distinct prohibitions, and one of those measures goes so far as to list the two prohibitions as separate subsections of the statute. See, e.g., Or. Rev. Stat. § 652.220 ("It is an unlawful employment practice . . . for an employer to: (a) [i]n any manner discriminate between employees on the basis of a protected class in the payment of wages or other compensation for work of comparable character . . .; (b) [p]ay wages or

In sum, I fail to see how a survey of state equal-pay measures compels the conclusion that the Maine Law Court would decide that Maine intended through the MEPL to enact an equal-pay measure as sweeping as the majority concludes that Maine has. Indeed, as even the majority must admit, only a minority of states have been held to have enacted a pay-equity measure that is as broad as that, and none of those measures shares the MEPL's unusual textual features.

### D.

There remains to be addressed only the MEPL's statutory history. See Scamman, 157 A.3d at 229 (noting that courts should only "look beyond" text to legislative history if the "plain language . . . is ambiguous"). The majority finds compelling support in that history for its reading of the MEPL. I do not.

The majority notes both that the MEPL did not use the word "discriminate" when the state first passed that measure in

---

compensation to any employee at a rate greater than that at which the employer pays wages or other compensation to employees of a protected class for work of comparable character."); W. Va. Code § 21-5B-3 ("No employer shall: (a) In any manner discriminate between the sexes in the payment of wages for [comparable] work . . .; (b) pay wages to any employee at a rate less than that at which he pays wages to his employees of the opposite sex for [comparable] work."); Ark. Code Ann. § 11-4-610 (using "or" in similar fashion as Massachusetts statute); Elizabeth J. Wyman, The Unenforced Promise of Equal Pay Acts: A National Problem and Possible Solution from Maine, 55 Me. L. Rev. 23, 39 n.106, 45 n.143 (2003) (listing former versions of Rhode Island and Washington equal-pay measures, which used "or" in a fashion similar to the Massachusetts statute).

1949 and that the MEPL at that time included a broad catch-all defense for any "other reasonable differentiation except difference in sex." Act of Aug. 6, 1949, ch. 262, 1949 Me. Laws 207. The majority thus finds it significant that just two years after the passage of the FEPA the MEPL was amended not only to add "discriminate . . . on the basis of sex" in the first sentence but also to remove the catch-all defense.

The timing of this change to the MEPL, according to the majority, supports -- and perhaps even requires -- the conclusion that Maine wanted to ensure that its equal-pay measure was at least as broad as the federal government's. But this sequence of events -- which, I note, pre-dates Corning Glass Works's intent-less construction of the FEPA -- equally could show that the Maine legislature chose to remove the catch-all defense from the statute on the understanding that the phrase "discriminate . . . on the basis of sex" required a showing that a pay disparity was based on sex and so rendered a catch-all unnecessary. The majority's gloss on the meaning of the sequence of events also fails to explain the legislature's choice to add at the time of the amendment the words "discriminate . . . on the basis of sex" to the first sentence of the MEPL.

I recognize that the Maine legislature did retain the specific mention of some pay differentials (e.g., a differential based on seniority) that are permissible so long as they did not

result from an employer's intentional sex-based discrimination. But, as I have explained, there is nothing anomalous about a pay-equity statute that sets forth some express safe harbors for clarifying purposes, and the text of the MEPL plausibly accommodates a reading in which the second sentence is doing just that.[37]

I also recognize that Maine has amended the MEPL several times after Corning Glass Works without altering the phrases that are our concern. But it is notoriously hazardous to draw inferences from what a legislature has not done. See Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1747 (2020) ("[S]peculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." (quoting Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 650 (1990))). And it is just as hazardous to do so here,

---

[37] The majority contends that the appellant waived this argument about an alternative way of understanding the legislative history by raising it for the first time at oral argument. But, even setting aside the fact that the line between raising issues and raising arguments for purposes of determining appellate waiver is not easily limned, see Yee v. City of Escondido, Cal., 503 U.S. 519, 533 (1992), I know of no precedent that requires us to take at face value one party's claim about legislative history just because the opposing side has failed expressly to point out that claim's logical limitations. And here I am relying on the supposedly waived argument merely to point out how speculative the appellee's own narrative about the legislative history necessarily is.

even if we were to account for the Maine legislature's quite recent choice to amend the MEPL to add race as a protected category. While that change occurred after the District Court's decision in this very case, nothing in the text or legislative history of that amendment indicates that Maine meant to be endorsing any specific way of reading the untouched phrases.

There is one last point about the statutory history to address. At oral argument, the appellee suggested that because the Maine Human Rights Act ("MHRA"), Me. Stat. tit. 5, § 4572(1)(A), is also on the books, it makes little sense to construe the MEPL to be intent-based. Why, the argument runs, would Maine have wanted to enact the MEPL if that statute would bar only conduct that is already prohibited by another statute?

Even if the MEPL were construed in the way that the majority rejects, however, the MHRA would not render the MEPL totally redundant, because the two statutes have different damages schemes. Compare Me. Stat. tit. 26, § 626-A (providing that a defendant found liable for violating the MEPL "is subject to a forfeiture of not less than $100 nor more than $500 for each violation," plus "unpaid wages . . . adjudged to be due, a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages") with Me. Stat. tit. 5, §§ 4613(2)(B) (providing that remedies for violations of the MHRA

"may include, but are not limited to" a cease and desist order, an order of reinstatement with or without back pay, civil damages up to $100,000, and compensatory and punitive damages), 4614 (providing for the award of reasonable attorney's fees and costs to the prevailing party in an MHRA action). And, in any event, the redundancy would mirror the redundancy that exists in federal law between the FEPA and Title VII.[38]  Moreover, because the MHRA was enacted years after the enactment of the textual features of the MEPL that are at issue in our case, the MHRA's existence hardly suffices to prove that the MEPL was intended to be as encompassing as the majority reads it to be.

## II.

Although the appellee is entitled to a federal forum for the resolution of this dispute over the meaning of the MEPL, the interpretive question that we must resolve is still one of Maine, not general, law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  We thus must decide that question as Maine's own courts would.  Id.  And, in doing so, we are supposed to be cognizant of the hazards of guessing incorrectly about what the state's highest court would do and sensitive to that court's special role in

---

[38] In fact, the legislative history of Title VII shows that Congress intentionally took steps to make Title VII more redundant with the FEPA, even by going so far as to incorporate the FEPA into Title VII by explicit reference.  See Cnty. of Wash. v. Gunther, 452 U.S. 161, 190–94 (1981) (Rehnquist, J., dissenting) (discussing history of the Bennett Amendment to Title VII).

interpreting the laws of its own state. Otherwise, we will end up paying lip-service to <u>Erie</u> while acting as if we are entitled to the last word.

Against that <u>Erie</u>-inflected backdrop, I find it significant that we confront an important Maine-law measure that not a single Maine court has construed; that is worded in a peculiar fashion deployed in the pay-equity laws of only three other states, none of which yet has been authoritatively construed in the relevant respect; and for which there is no decisive state-law rule of construction that applies. In consequence, in trying to decide for ourselves whether, to be liable under the MEPL, an employer must be shown to have intentionally discriminated on the basis of sex in paying differential wages, the risks are unusually high that we will mistake our own powers of reason for those of the court whose exercise of those powers is ultimately determinative.

Nor would the consequences of our making that mistake be trivial. By substituting our own guess for the Maine Law Court's definitive answer, we reduce the chance for that court to have an opportunity to offer its own resolution in a future case.[39] In the

---

[39] Similarly, even if the Maine Law Court were to agree with the majority that no catch-all defense is implicit in the MEPL, that court still might conclude that other kinds of defenses are implicit in the statute. In <u>Scamman</u>, for example, the Maine Law Court declined to read a catch-all defense into the MHRA but did read a "business necessity" defense into it for age-discrimination

meantime, we also necessarily -- and, in my view, needlessly -- create uncertainty for employers and employees in Maine alike, because any construction of this statute that we provide is inherently provisional while the Maine Law Court's word is definitive once given.

Why, then, not get that court's last word now?  True, by asking for it, we would be adding to the burdens of an already busy state court.  But we would be doing so in a case that presents a question of broad public import and to which -- at least in my view -- the answer is hardly all but clear.

I thus do not think we would be shirking our interpretive duties by certifying the question before us to the Maine Law Court. I think we would be prudently ensuring that we would not be overstepping them.  In my view, then, in this case we should accept the general invitation that Maine has extended to us to certify difficult interpretive questions of Maine law to the Maine Law Court to resolve, given that I cannot see how we can be confident how the Maine Law Court would answer the specific question of Maine

---

claims even while acknowledging that the text itself did not provide for one.  157 A.3d at 230.  The majority's reading of the MEPL, then, could lead to summary judgment being granted against employers when the Maine Law Court might very well conclude that there are other defenses yet available to employers even if no proof of an employer's intentional discrimination on the basis of sex is required.

law that we confront here, <u>see</u> Me. Rev. Stat. tit. 4, § 57; Me. R. App. P. 25(a). Accordingly, I respectfully dissent.